## KOHN v. EIMER et al.

(Circuit Court of Appeals, Second Circuit.  February 28, 1920.)

No. 141.

1. **Patents ⊚⟶159—Expert testimony not required in patent cases, if court understands specifications.**

Expert testimony as to the meaning of patent specifications is only permissible to enable the judge to understand the specifications, and when the judge understands the specifications without such testimony, it is not necessary since the adoption of the new equity rules (198 Fed. xix, 115 C. C. A. xix).

2. **Patents ⊚⟶159, 324(5)—Determination of necessity of expert testimony not reviewable, except in clear cases.**

It is for the judge trying a patent infringement suit to decide whether he needs the assistance of experts to understand specifications of patents relied on as prior art, and his decision will not be disturbed, except in the clearest case.

3. **Patents ⊚⟶328—Claims for electric furnace invalid.**

Claims 1, 3, 8, and 11 of the Kohn patent, No. 983,291, for an electric furnace, consisting of separate heating units, each form being removable, and the coil being removable from each form, *held* invalid for anticipation and want of invention.

4. **Patents ⊚⟶129—Licensee from unauthorized party not estopped to deny validity.**

Under an assignment of a patent, providing for reversion to the patentee in case of dissolution or termination of the assignee, if, as claimed by the patentee, the sale by the corporate assignee of all its assets caused the patent to revert, a license subsequently granted by the assignee did not estop the licensee to dispute the validity of the patent.

Appeal from the District Court of the United States for the Southern District of New York.

Suit by William M. Kohn against August Eimer and another. From a final decree dismissing the bill of complaint, with costs, plaintiff appeals. Affirmed.

The invention related to small electric furnaces, and was aimed at providing a furnace consisting of separate heating units, such that, if any one of them should become defective, it might be replaced by a standard form. In general, it consisted of a vertical cylindrical outer body of nonconducting material, with a circular space within, fitted to receive a cylindrical pot. The inner and heating wall of the furnace were formed of duplicate units or forms made of nonconducting material standing upright around the inside. The concave or inner face of these forms had vertical grooves, within which passed the resistance coils to carry the current, in a way well known. The coil was continuous from one end of each form to the other, and the terminals of the four forms were so arranged that they could be used either in multiple or in series at will. As each form could be separately removed, and the coil of each itself removed from the form, the device offered an easy means for correcting any defect in the wiring in any single form.

Upon the trial the plaintiff confined the case to four of the claims, Nos. 1, 3, 8, and 11, which are as follows:

"1. An electric heater, comprising a body portion a plurality of forms which are duplicates of each other, a heating element located in each of said forms and removable therefrom without injury thereto, means located in said body portion for connecting the ends of said heating elements, and a lining wall adjacent to said forms and having a chamber formed therein."

"3. An electric heater, comprising a body portion having an upwardly extending wall, a plurality of forms located adjacent to said wall, an electric conductor carried by each form, means for connecting the conductors in one form to that of an adjacent form, means for covering and holding said forms in position within the body portion, and means for connecting said conductors in series or multiple circuit arrangement."

"8. An electric heater, comprising a body portion having an upwardly extending wall, a plurality of forms located adjacent to said wall, an electric conductor carried by each form, means for connecting the conductors in one form to that of an adjacent form, and means for covering and holding said forms in position with the body portion."

"11. A heater, comprising a body portion having an upwardly extending cylindrical wall, a plurality of removable forms shaped to conform to said upwardly extending wall and each provided with an electrical conductor, a separable inner wall located adjacent to said forms, and means for covering the top ends of said forms."

In claims 1 and 11 the phrase, "inner wall located adjacent to said forms," refers to the cylindrical pot which slipped up and down within the furnace and held the forms in place. Electrical furnaces of this general character have been familiar for some time in the art. Patent No. 589,048, to C. A. Timme, issued in 1897, disclosed one form. The furnace was cubical with the opening at one side. Wires were imbedded in removable horizontal heating plates of refractory material at the bottom and top, and there might be vertical plates along the sides as well. The resistance of these wires created the heat within the furnace. The form of the furnace was different from that of the plaintiff's, and the wires could not be removed from the plates as in the plaintiff's case.

The defendant Eimer in 1903 took out a patent (No. 736,509) for a similar furnace, horizontal and lying on a flat bottom. The top, however, consisted of an arch or dome, making the whole a half cylinder lying upon its flat side. The base plate was of refractory material, and could be slid in and out, and the wires were so arranged that they could be removed from the base plate, if broken, and rethreaded. The arched dome could also be removed, and in it the conductor might be threaded in grooves, so as to be removed, if broken.

On the same day Eimer took out another patent (736,917) for a modified form of furnace. This was composed of three horizontal sections end to end; each section having three heating walls, apparently removable, one at the base and one on each side. The heating wires in the refractory material might be sunk in longitudinal grooves, which permitted them to be removed and rethreaded, if broken. Proper connections permitted the three longitudinal sections to be used, either in series or multiple. Likewise the conductors in each section might be separated, and could then be used either in series or in multiple.

Capek, 449,035, showed an upright furnace, which might be of any shape, containing a pot within, a heater at the base, made up of two forms, which might be arranged in either multiple or series. In several prior art furnaces the chamber was a cylinder, as in Hatch (640,283), Conlin (677,399), Hatch (741,333), and Marsh (861,744).

The relations of the parties were as follows: On June 15, 1910, Kohn assigned his patent to the Multiple Unit Electric Company, a corporation, with the following reservation: "In the event of the dissolution or other termination of the party of the second part within five years from the date of these presents, that said patents and property rights shall revert to and again be the sole property of the party of the first part" (Kohn). The corporation continued business for 18 months, but finally, on January 31, 1902, sold all its tangible assets to the defendant Eimer. In February the corporation wrote to several of its customers that it was no longer in active business and had sold its plant to Eimer. All its books were taken to the office of its attorney and its business office was closed. Eimer took over the business and eventually organized a corporation, the Electric Heating Apparatus Company, the other defendant. The plaintiff went to work for the two defendants until, because of certain differences between them, he was discharged on June 30, 1913. On July 2, 1913, possibly in fear of some action of the plaintiff, Eimer

obtained a license from the Multiple Unit Electric Company under the patent in suit, and paid license fees until May 22, 1914. The defendants' manufacture was a frank copy of the patent in suit, except that they did not supply the cylindrical pot which fitted into the middle of the furnace proper. The bill was filed in February, 1918.

Ralph L. Scott, of New York City (C. A. L. Massie and Clifford E. Dunn, both of New York City, of counsel), for appellant.

Rose & Paskus, of New York City (Conrad A. Deiterich, of New York City, of counsel), for appellees.

Before ROGERS and MANTON, Circuit Judges, and LEARNED HAND, District Judge.

LEARNED HAND, District Judge (after stating the facts as above). [1, 2] At the outset the appellant challenges our right to examine the prior art patents at all, because the appellee called no expert at the trial to explain them. Waterman v. Shipman, 55 Fed. 982, 987, 5 C. C. A. 371. We have not the slightest wish to minimize the vital importance of expert testimony in patent suits, or to suggest that we are not absolutely dependent upon it within its proper scope; but that scope is often altogether misapprehended, as the appellant has misapprehended it here. Specifications are written to those skilled in the art, among whom judges are not. It therefore becomes necessary, when the terminology of the art is not comprehensible to a lay person, that so much of it as is used in the specifications should be translated into colloquial language; in short, that the judge should understand what the specifications say. This is the only permissible use of expert testimony which we recognize. When the judge has understood the specifications, he cannot avoid the responsibility of deciding himself all questions of infringement and anticipation, and the testimony of experts upon these issues is inevitably a burdensome impertinence.

Now the question whether the judge needs the assistance of experts to understand the specifications is for him to decide. Doubtless he ought to be chary of assuming too readily that he does understand what he may not; but, if he is too confident, his mistake eventually transpires. The important point is that it is he who must determine when he needs the help of experts and when he does not, and that decision, except in the clearest case, we should not be disposed to disturb. Waterman v. Shipman, supra, was written when no judges presided at the trial, and when, therefore, there was no one to decide whether or not expert testimony was necessary. It has no application whatever since the new equity rules (198 Fed. xix, 115 C. C. A. xix), the whole purpose of which, in this regard, was to render suits in equity less oppressive to suitors by some control over the admission of evidence. One of the chiefest scandals of the old procedure was the interminable examination of experts, to extract their opinions upon the very issues which the courts alone could decide. The logomachy which resulted from the cross-examination of an expert by the opposing lawyer was arid beyond belief. No one read it, every one was annoyed by it, and some one paid for it.

In the case at bar we see no reason whatever to differ from the learned District Judge in his conclusion that the specifications of all these patents speak a language comprehensible enough, without experts, for the disposal of the case. As this was all that he ought to have used it for in any event, we do not see how he could have done differently.

[3] Kohn's invention depends upon the shape of the furnace, the interchangeability of the duplicate forms, the removability of the coils from each form, and the possibility of change from multiple to series connection. The first Eimer patent (736,509) showed in the clearest way the removability of the wires from the bottom plate (page 1, lines 75–85) and the same function was disclosed for the curved dome (page 2, lines 12–20). Both bottom plate and dome were separately removable, though of course not mutually interchangeable. Furthermore, this patent shows an added conductor in the bottom plate (Figure 7), which may be connected in multiple or in series with the main conductor (page 1, lines 95–102).

Eimer's second patent was for a longitudinal series of furnaces, of which each one contained three heating plates, the two side plates being duplicates. The conductors in these plates, as well as the separate furnaces, might be connected in series or in multiple (page 2, lines 110–116). An optional form of setting the conductors in the refractory plates is shown in Figure 4, where they are not imbedded, but are sunk in grooves or depressions (page 1, lines 86–91), from which they might be removed.

Timme's two patents (U. S. 589,048; German, 95,322) contained removable and interchangeable sides and top and bottom heating plates. If set up on end, it would differ from Kohn's only in that its horizontal section was a square, instead of a circle, the wires were imbedded in the plates, and there was no alternate connection in multiple or series.

Capek (449,035) clearly supplied the last requirement, which he described in detail (page 2, lines 24–60). Even if Eimer's disclosures were insufficient, this left nothing for Kohn in this feature, because Capek's heater was divided into two similar sections, of three units each. These units are each separably removable, and the wire from each as well. He also shows a pot slipping in and out vertically, precisely like Kohn's, and, we think, circular in horizontal section (page 1, lines 19–21), though perhaps that is not wholly clear.

In the face of this art we fail to see any invention in Kohn's furnace. Each element is old, and if the combination of all the elements is not shown, as it is not, the difference appears to us to be only one of design. Certainly it was not invention to set on end the cylindrical furnaces of Hatch, Conlin, or Marsh. Assuming it is a convenience, as we do not deny, to have forms of but one shape, so that any broken form may be replaced by a single reserve, Timme shows it. The removability of the conductors, an element only in claim 1, is shown in both Eimer's patents, as well as a form of segmental shape in his first patent. The connection in series or in multiple Capek shows, as well as the removable pot.

As in any other case, we should of course yield our a priori conclusion to the history of the art itself; but here we get no evidence from that. The patent has not displaced other furnaces; the art got on quite as well before as after it. That it was a handy design, combining the prior elements, though in no new functional relation, we agree; but that, we think, did not put it beyond the competence of an ingenious journeyman designer. All the parts operate as they had before, and produce the same combined result as before. We think the claims void for lack of invention.

[4] As to the estoppel, the appellant is in this dilemma: Either the patent did not revert to him by the sale of January 31, 1912, of the assets of the Multiple Unit Electric Company, or it did. He asserts, and indeed must assert, that it did, upon the theory that the sale was a termination of the corporate life within the meaning of his original contract. As to that, we are not disposed to quarrel with his position. But, if so, the Multiple Unit Electric Company ceased to be the owner of the patent on that date, and, if it did, its license on July 2, 1913, was the license of an outsider. Now it appears to us absurd to say that, where some one other than the patentee grants a license, the licensee is estopped to dispute the validity of the patent. We make no question of a case in which the license had originally come from the patentee and his assignee subsequently sues. But that is not this case. The estoppel which arises from a license is mutual, and includes as much the protection of the licensor from suit for infringement as the licensee's incapacity to dispute the validity of the patent. Were it not so, a license once accepted would be an estoppel forever, though the rule is settled that, when the license is ended, the estoppel disappears with it. Tate v. Baltimore, etc., R. R., 229 Fed. 141, 143 C. C. A. 417; Dueber Watch-Case Mfg. Co. v. Robbins, 75 Fed. 17, 26, 21 C. C. A. 198. There must be some privity between the two; some bargain between the licensee and one who holds title at the time. Mere admissions may be of weight, but they are not conclusive; here the motive was clear, and explains the reason for taking a license. No one, we suppose, would urge that a defendant in ejectment would be estopped by a lease taken from an earlier owner, who had conveyed before the lease was given. We accept the reasoning of the learned District Judge on this question.

Decree affirmed, with costs.

NOTE. The following is the opinion of Augustus N. Hand, District Judge, on final hearing in the court below:

AUGUSTUS N. HAND, District Judge. This is a suit for infringement of United States patent No. 983,291 to Milton M. Kohn, brought by the inventor against August Eimer, individually, and the Electric Heating Apparatus Company, which Eimer owned and controlled. The complainant, on June 15, 1910, assigned to the Multiple Unit Electric Company, by written instrument of that date, "his certain applications for patents on his inventions for electric furnaces numbered 520,515, dated October 1, 1910, for electric cooking and heating devices, numbered 525,425 dated October 30, 1909, together with all his right, title, and interest of, in, and to the same, or any of them, and also to any improvements or developments of any of the same which he may hereafter invent or make, for a period of ten years from date of this

agreement; "it being expressly understood and agreed that in the event of the dissolution or other termination of the party of the second part, within five years from the date of these presents, that said patents and property right shall revert to and again be the sole property of the party of the first part, and that all rights and liabilities of either party hereto under this contract shall cease and come to an end."

The foregoing instrument provided that the complainant should receive a majority interest in the stock of the Multiple Unit Electric Company in consideration for the above assignment, and that he should contract to serve the company as general manager for a period of five years at a salary of not less than $2,600 for the first year. The application, No. 520,575, mentioned in the agreement, thereafter resulted in the patent in suit, No. 983,291. January 31, 1912, the Multiple Unit Electric Company sold all its tangible assets to the defendant Eimer, and that very month the complainant, who had protested against the sale, which had been authorized by a board of directors of the Multiple Unit Electric Company, the majority of which differed with his views, went into the employment of the defendant Eimer and worked upon electric heaters of the general sort embraced in complainant's invention. The president of the Multiple Unit Electric Company wrote various persons having business relations with that company that it had sold its plant to Eimer, who has since conducted business under the trade-name of the company, and that it was no longer engaged in active business. All the books of the company were taken to the office of its attorney, and its business office was discontinued. Eimer in a letter written shortly after (Plaintiff's Exhibit 2) said: "Until the company is liquidated" he would carry on the business in his own name, or "under the name of Electric Heating Apparatus Company—the new company, which has not as yet been incorporated."

Kohn remained working for Eimer and the defendant Electric Heating Apparatus Company, which the latter incorporated to do his business, for a year and a half. Kohn did not satisfy Eimer and was finally discharged. Thereupon, on July 2, 1913, the Multiple Unit Electric Company made a written license to Eimer to make and sell furnaces under the Kohn patent upon a 5 per cent. royalty, and Eimer has paid $251.88 under this license, for 120 electric furnaces made and sold under the Kohn system. This, he says, he ceased to do May 22, 1914.

It is in general true that the existence of a corporation cannot be attacked collaterally, and dissolution only occurs when decreed by a court in dissolution or quo warranto proceedings. The reverter clause contains the word "termination," as well as "dissolution." This clause should be given some meaning, and I think its meaning was that of a practical cessation from all business. This is the only meaning, I think, which gave Kohn any protection, and it seems clear to me that, if it abandoned its business and sold its property, the parties intended that Kohn should receive the entire interest in his patents and patent applications. In this view, it is immaterial whether the rights transferred to the Multiple Unit Electric Company were legal or equitable. If the former, the legal title reverted to Kohn; and, if the latter, he had never parted with the legal title, and the equitable title, which he had transferred, reverted to him by virtue of the termination of the corporation.

The letter from the Multiple Unit Electric Company to the Huntoon Simmons Ice Company, under date of February 14, 1912, gives the contemporaneous construction of the rights of the Multiple Unit Electric Company in the Kohn patent, and contains the following formal notice: "Please take notice that the Multiple Unit Electric Company, a corporation, is not now actively engaged in business, having sold its plant, stock, etc., on January 31, 1912, to Mr. August Eimer, of New York City, who has since conducted business under the trade-name and style heretofore used by our company."

Such action, accompanied by an abandonment of the business of the company on its part, and employment of Kohn by Eimer, not only constituted the sort of "termination" of the company referred to in the reverter clause, but completely estopped the company from claiming that Kohn, who had left it by mutual consent to work on electric heaters for Eimer, had not a right to avail himself of his patent rights. The subsequent license to Eimer was, I think, taken by the latter to protect himself as far as he could from any

claims of Kohn after he had parted with the latter. Eimer could not, of course, question the validity of the patent as against the Multiple Unit Electric Company; but he can question it as against another owner, and by virtue of the reverter clause, I think, Kohn, and not the Multiple Unit Electric Company, is the true owner. As the Multiple Unit Electric Company does not own the patent, its license is of no effect.

Passing to the question of original validity, I cannot find any invention in the patent in suit, in view of the patents to Eimer, Nos. 736,509 and 736,917. In Eimer's patent No. 736,509, the heating wire is placed in undercut grooves, and in No. 736,917, there are no undercut grooves. These furnaces are illustrated in the Eimer & Amend catalogue of 1905, at page 139, and the difference in design shown in the Kohn diagrams did not constitute invention. The lining wall called for by claims 1 and 11 of the patent in suit could be readily employed, instead of a crucible, if preferred. I cannot imagine such an addition to a then well-known form of furnace a sufficient improvement to create a patentable combination. The Timme German patent is a further reference from which Eimer may have derived most of his original ideas. Whether it be a competent reference, in view of the answer to the interrogatories, has been questioned; but it can make no difference in any case. The Eimer patents are sufficient to deprive the Kohn furnace of any such novelty as justifies patentability. I may say, however, that the case of Johnson v. Lambert, 234 Fed. 886, 148 C. C. A. 484, in my opinion allows proof of the state of the art by any pertinent reference.

The Eimer patent, No. 736,917, has a body portion, an upwardly extending wall, a plurality of forms, an electric conductor carried by each form, means for covering and holding the forms in position within the body portion, and the specification indicates that the conductors can be connected in series or multiple. There is really no element of claims 3 and 8 of the Kohn patent that is not referred to.

It is to be particularly noticed that the Eimer patent No. 736,917, says that, "instead of being imbedded within said sections, the conductor, as *10*, may be sunk or located in longitudinal or other depressions or grooves, as *13* (see Fig. 4), formed in the inner surface of the sections, which depressions or grooves partly inclose the conductor, while leaving it partly exposed to permit a more intense radiation of its incandescence within the furnace." This discloses, not only the ready removability of the section, but also of the wire dwelt upon in the Kohn patent. I think Eimer evidently testified correctly when he said he claimed Kohn was infringing his patents, and that the latter said, "Mr. Eimer, if you let me be your manager and go with you, with your patents and mine, and my knowledge of the manufacture and my system, I can make a good success." I think it evident that Kohn did not make a success as manager and was discharged for that reason. Eimer took a license from the Multiple Unit Electric Company to protect himself, but really received nothing. Whatever there was belonged to Kohn, and I can see nothing in the Kohn patent, in view of the prior art.

The bill is dismissed, with costs, because the patent is void for lack of invention.