TECHNOGRAPH PRINTED CIR-
CUITS, LTD.,
and
Technograph Printed Electronics, Incorporated, Plaintiffs,

v.

MARTIN–MARIETTA CORP., Defendant.
TECHNOGRAPH PRINTED CIRCUITS,
LTD., et al., Plaintiffs,

v.

WESTINGHOUSE ELECTRIC CORPO-
RATION, Defendant.

TECHNOGRAPH PRINTED CIRCUITS,
LTD., et al., Plaintiffs,

v.

INTERNATIONAL TELEPHONE AND
TELEGRAPH CORP., Defendant.

TECHNOGRAPH PRINTED CIRCUITS,
LTD., et al., Plaintiffs,

v.

McDONNELL AIRCRAFT CORP.,
Defendant.
Civ. A. Nos. 13358, 14084, 14299
and 14374.

United States District Court,
D. Maryland.
March 20, 1972.

John W. Avirett, 2d, Piper & Marbury, Baltimore, Md., Sidney Bender, and Leventritt, Lewittes & Bender, New York City, for plaintiffs.

Benjamin C. Howard, and Miles & Stockbridge, Baltimore, Md., for defendant Martin-Marietta Corp.

Benjamin C. Howard, Miles & Stockbridge, Baltimore, Md., Edward F. McKie, Jr., and Birch, Swindler, McKie & Beckett, Washington, D. C., for defendant, Westinghouse Electric Corp.

Norwood B. Orrick, Venable, Baetjer & Howard, Baltimore, Md., Dana M. Raymond, and Brumbaugh, Graves, Donohue & Raymond, New York City, for

defendant International Telephone and Telegraph Corp.

Jervis Spencer Finney, Ober, Grimes & Shriver, Baltimore, Md., Albert E. Fey, and Fish & Neave, New York City, for defendant McDonnell Aircraft Corp.

WATKINS, Senior District Judge.

Technograph Printed Circuits, Ltd., the owner of, and Technograph Printed Electronics, Inc., exclusive licensee under, Eisler United States Patent No. 2,-706,697 ('697) [1] (hereinafter plaintiffs) have filed suits against Martin-Marietta Corporation, Westinghouse Electric Corporation, International Telephone and Telegraph Corporation and McDonnell Aircraft Corporation (hereinafter defendants) for alleged infringement of method Claims 4 and 10–14 inclusive of '697. Each of the defendants, having "opted out" of class litigation in the District Court for the Northern District of Illinois, has filed a Motion to Dismiss, the grounds being that the decisions in Technograph Printed Circuits, Ltd. v. Bendix Aviation Corporation, 218 F.Supp. 1 (D.Md.1963), affirmed 327 F.2d 497 (4 Cir. 1964), cert. den. 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36 (1964) (hereinafter Bendix) constituted collateral estoppel against the prosecution of these suits. Plaintiffs, of course, contend that under Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L. Ed. 949, there was, and could be, no estoppel where the parties in the prior and subsequent suits were not identical. The question of the viability and scope of Triplett was elaborately briefed, and discussed in conferences, and memoranda, and was the subject of at least one order. Before an opinion was filed by this Court, the United States Supreme Court granted certiorari in Blonder-

Tongue Laboratories, Inc. v. University of Illinois Foundation, and on May 3, 1971 filed its opinion therein. 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788. That decision [2] held that a plea of estoppel was not automatically to be accepted, but that "the court in the second litigation must decide in a principled way whether or not it is just and equitable to allow the plea of estoppel in the case before it." (402 U.S. at 334, 91 S.Ct. at 1445). The criteria established by the Supreme Court are so critical that direct quotations, rather than paraphrase, is indicated. The Supreme Court said (402 U.S. pages 332–334, 91 S.Ct. page 1444, footnotes omitted):

> "Even conceding the extreme intricacy of some patent cases, we should keep firmly in mind that we are considering the situation where the patentee was plaintiff in the prior suit and chose to litigate at that time and place. Presumably he was prepared to litigate and to litigate to the finish against the defendant there involved. Patent litigation characteristically proceeds with some deliberation and, with the avenues for discovery available under the present rules of procedure, there is no reason to suppose that plaintiff patentees would face either surprise or unusual difficulties in getting all relevant and probative evidence before the court in the first litigation.
>
> "Moreover, we do not suggest, without legislative guidance, that a plea of estoppel by an infringement or royalty suit defendant must automatically be accepted once the defendant in support of his plea identifies the issue in suit as the identical question finally decided against the patentee or one of his privies in previous litigation.

---

1. The first Eisler application for a United States Patent, Serial Number 520,991, was filed February 3, 1944. Patent No. 2,441,960 ('960) issued on May 25, 1948. On February 27, 1948, a divisional application 11,798 was filed out of which Patent No. 2,257,568 issued on February 26, 1952, and was subsequently reissued on June 12, 1956 as United States Reissue 24,165 ('165). Divisional application 11,798 was further divided by Application 261,989, filed December 17, 1951, and issued on April 15, 1955 as Patent No. 2,706,697 ('697).

2. This Court's own tentative conclusion was quite similar to the result reached by the Supreme Court.

Rather, the patentee-plaintiff must be permitted to demonstrate, if he can, that he did not have 'a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time.' Eisel v. Columbia Packing Co., 181 F.Supp. 298, 301 (Mass.1960). This element in the estoppel decision will comprehend, we believe, the important concerns about the complexity of patent litigation and the posited hazard that the prior proceedings were seriously defective.

"Determining whether a patentee has had a full and fair chance to litigate the validity of his patent in an earlier case is of necessity not a simple matter. In addition to the considerations of choice of forum and incentive to litigate mentioned above, certain other factors immediately emerge. For example, if the issue is nonobviousness, appropriate inquiries would be whether the first validity determination purported to employ the standards announced in Graham v. John Deere Co., [383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545] supra; whether the opinions filed by the District Court and the reviewing court, if any, indicate that the prior case was one of those relatively rare instances where the courts wholly failed to grasp the technical subject matter and issues in suit; and whether without fault of his own the patentee was deprived of crucial evidence or witnesses in the first litigation. But as so often is the case, no one set of facts, no one collection of words or phrases, will provide an automatic formula for proper rulings on estoppel pleas. In the end, decision will necessarily rest on the trial courts' sense of justice and equity.

"We are not persuaded, therefore, that the Triplett rule, as it was formulated, is essential to effectuate the purposes of the patent system or is an indispensable or even an effective safeguard against faulty trials and judg-

ments. Whatever legitimate concern there may be about the intricacies of some patent suits, it is insufficient in and of itself to justify patentees relitigating validity issues as long as new defendants are available. This is especially true if the court in the second litigation must decide in a principled way whether or not it is just and equitable to allow the plea of estoppel in the case before it."

This Court has carefully considered the briefs and arguments in these cases, consolidated for the purpose of the motions to dismiss, has reviewed its previous decision and the authorities therein relied upon; has studied the briefs before the Fourth Circuit on the original argument and on motion for reargument en banc and on petition for certiorari to the Supreme Court of the United States; the decision of Commissioner Davis of the Court of Claims in Technograph Printed Circuits, Ltd., et al. v. United States, 164 U.S.P.Q. 584 (1970) and his Findings of Fact and Conclusions of Law; and the House of Lords decision in Mills & Rockley (Electronics) Limited v. Technograph Printed Circuits Limited, February 24, 1971. The Court has also considered what is tendered in plaintiffs' briefs and exhibits as new evidence.[3]

It is conceded that the issue in suit is the identical question finally decided against the plaintiffs in Bendix, who are the plaintiffs here.

It is the Court's firm opinion that:

(A) Plaintiffs in Bendix had "a fair opportunity procedurally, substantively and evidentially to pursue" their "claim the first time";

(B) the standards with respect to obviousness announced in Graham v. John Deere, 383 U.S. 1, 10, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) were met;

(C) The opinions in the Bendix case do not indicate that it was one of those "rare instances where the courts wholly

3. Most of this could, with reasonable diligence, have been available for introduction in the Bendix trial; and to the extent that it could not, the Court does not believe that its introduction in the pending cases would change the result reached in Bendix.

failed to grasp the technical subject matter and issues in suit";

(D) the plaintiffs were not deprived "without fault" of their own "of crucial evidence or witnesses" in the Bendix case;[4] and

(E) "it is just and equitable to allow the plea of estoppel" in these cases.[5]

Since these conclusions require the dismissal of the four cases, and since an appeal is almost inevitable, a statement of reasons for the above conclusions is justified, if not required.

(A) Plaintiffs had a fair opportunity procedurally, substantively and evidentially to pursue their "claims the first time"; and (D) were not deprived "without fault" of their own "of crucial evidence or witnesses" in the Bendix case.

(A) The "fair opportunity" that plaintiffs had in the Bendix case involved numerous pretrial conferences and hearings on preliminary motions all elaborately briefed, and usually fully argued. In addition to twenty-nine court days of trial, four days of travel were spent, at the request of counsel, visiting plants of licensees and of Bendix. Plaintiffs filed 458 exhibits and defendant 543 exhibits. These included depositions (including that of Eisler); file wrappers of patents in the hundreds of pages; and pamphlets, printed publications, patents and correspondence, amounting to thousands of pages. After the last day of trial, counsel were permitted to file briefs, totalling in excess of 600 pages, followed by two days of arguments. Submission of new cases, references to modification of plaintiffs' licensing procedures, and new British patent action, thereafter extended over a period of months.

Highly experienced and efficient counsel certainly by the most exacting standard had a "fair opportunity" to develop fully their theories and positions. The court was lenient in its rulings on admissibility; and no claim was or is now made that the court excluded any relevant evidence offered.

(D) Deprival without fault of "crucial evidence or witnesses" in the Bendix case.

Plaintiffs urge that:

(1) Defendant's Exhibit 705 in the Court of Claims, dated June 11, 1951 is a disclosure of the Signal Corps alleged Silver Plating Resist process "which is really the same as Eisler's metallic resist process disclosed in Eisler's February 3, 1944 application in the United States Patent Office".

(a) As plaintiffs admit in their reply brief, this document was in fact in evidence in the Bendix case as part of plaintiffs' Exhibit 443.

(b) The tremendous importance of this document is claimed to be that:

(i) It disclosed the significance of the "common cathode". This court in Bendix had recognized that this factor was claimed as a virtue of Eisler's inventions. 218 F.Supp. 7.

(ii) It showed the significance of the "disclosure" of the Eisler metallic resist in 1944.

In fact, Eisler never, in the specifications of '960, Re '165, or '697, disclosed a metallic resist except in connection with a "transfer" method (Claim 5 of '697—held invalid by this court in Bendix, 218 F.Supp. 36, 43–44.)

The real significance of the Signal Corps disclosure is that it triggered Eisler's attorneys for the first time to try to obtain claims, never before suggested by Eisler or his attorneys, for a metallic resist, unassociated with transfer. 218 F.Supp. at 45–46; 164 U.S.P.Q. at 587–589.[6]

4. (A) and (D) would often, and do here, overlap.

5. Westinghouse filed the only brief in response to plaintiffs' Memorandum, but it was adopted without reservation by the other three defendants.

6. "And, indeed, it was only after the 'metallic resist' process was publicly disclosed

(2) Defendant's Exhibit 708 in the Court of Claims, dated February 27, 1952, of the Signal Corps, referring to the common cathode, and the metallic resist, of the Signal Corps' development.

(a) There is no showing that this document could not have been secured through Danko of the Signal Corps, through whom defendant's Exhibit 705 was obtained; or of its materiality in view of defendant's Exhibit 705.

(b) Defendant's Exhibit 705 refers to electroplating, "using a single connector to the cathode bar"—a common cathode.

The first paragraph of defendant's Exhibit 705 reads:

"(A production method whereby a heavy silver plate is obtained on a copper conductive surface without the use of connecting multiple [indecipherable] electrode terminations to discontinuity circuits. One termination is all that is required.)"

(3) RCA documents.

Plaintiffs refer to three communications from RCA's European technical representative to RCA officials, dated January 15, 1948, June 2, 1948 and June 4, 1948. They all deal exclusively with the "print and etch" methods of '960.

(a) There is no showing that these letters could not have been produced in the Bendix case. Eisler's desposition in that case referred to the visit of an RCA representative to the Technograph facilities in London, and a disclosure to him of Technograph methods. Certainly this should have alerted plaintiffs' counsel to the possibility of the existence of RCA records with respect thereto.

(b) One of the letters refers to the "possibility of a new and revolutionary technique". There is no indication that the writer was familiar with any of the print and etch art.

(c) Plaintiffs argue that this statement "applied to the entire application,

which also described the metallic resist process".

The references to the addition of metal to metal are all given only as a step preceding transfer. '960, Col. 6, lines 41–47; Col. 6, line 70; Col. 7, line 2. As heretofore noted, Eisler did not file a transfer claim until 1951, or a metallic resist claim until 1955.

(d) Significant as to Eisler's concept of the scope of his disclosures is the statement in the Memorandum of Henderson & Spalding dated January 15, 1948, and forwarded with the letter of the same date. After stating that the first seven claims had been allowed, the Memorandum continues:

"The remainder of our original claims have to be sub-divided, and re-filed within their appropriate divisions, with priority rights as from the date of our first application. The reason for sub-division is stated to be that as our claims covered uses in many fields in addition to that of making electrical wiring boards, as for instance to the production of various types of coils, to the use of foldable conductive patterns for the winding of small motors, and to the making of low temperature wall paper for domestic heating, and others, such divisional applications were necessary."

(4) Testimony by Cottle, a former General Electric Company employee, in the Chicago case; and

(5) A statement by Judge Will recognizing the value of the common cathode.

(a) There is no showing why the testimony of Cottle, if significant, could not have been produced in the Bendix case.

(b) The disclosure of a common cathode in '960 was recognized by this Court. 218 F.Supp. at 7.

(6) Testimony by Dr. Ziegler, defendants' expert in Chicago.

by others in 1951 and 1952 (finding 29) and after one of Eisler's attorneys became aware in 1952 that the process was in use

in industry (finding 27) that claims thereto were inserted in 1953 and 1955." (164 U.S.P.Q. at 589).

Dr. Ziegler is quoted as making the "admission" that the Signal Corps reversal process "achieved very significant new properties."

(a) This was established by the Signal Corps memorandum of June 11, 1951, defendant's Exhibit 705, part of plaintiffs' Exhibit 443 in the Bendix case.

(b) Plaintiffs argue that if the Signal Corps process, published in 1952, achieved very significant new properties, "then Eisler's '697 metallic resist *claims* achieved the same and were nonobvious since in principle both were the same, but Eisler was first." (Emphasis supplied).

Unfortunately for plaintiffs, the first of "Eisler's metallic resist *claims*" (emphasis supplied), was not filed until January 1953 [7] as application claim 11, which is similar to claim 4 of '697. Application claims 30 and 31 (patent claims 10 and 14) were filed in January of 1955.[8]

To gild the lily, June 11, 1951 and February 29, 1952 are both prior to January 1953 and January 1955.

(7) Lauback patent.

This is a German patent issued March 4, 1934, not cited in the prosecution of the Eisler application, and not offered in the Bendix case.

(a) No explanation is given as to why, by reasonable diligence, this patent could not have been discovered in time to introduce it in the Bendix case.

(b) The Lauback process is complicated and expensive, and perhaps deserves Judge Will's comment as to the improbability of commercial use, and as to its "Rube Goldberg" approach. With all its drawbacks, it appears to have been susceptible of reduction to practice. The parties in the Chicago case stipulated:

"74. The component *produced* by the process of the Lauback German patent, No. 642,447, *is* an electrical component having an insulating base with a conductive pattern in one metal covered with a *protective layer of another* metal." (Emphasis supplied).

(8) Commercial success.

The parties in the Chicago class action stipulated that by September 27, 1962 the processes which plaintiffs contend are covered by '697 "had come into and continued to be in wide and extensive use in the electrical and electronics industry throughout the United States."

■ The question of the significance of commercial success was considered by this Court in Bendix, 218 F.Supp. 51–52. As there stated, commercial success is significant only in cases of doubtful validity. This Court then was, and still is, satisfied that invention is lacking. The court in Bendix also considered the significance of plaintiffs' licensing practices and their very substantial war chest of one-half million dollars; and that the progress of printed circuitry is attributable to the development of satisfactorily bonded metalized laminate rather than to any gain in knowledge of printing and etching metals. As this Court noted (218 F.Supp. 52) many were working at about the same time as Eisler on printing and etching techniques. None succeeded commercially until a satisfactory bonding of metal to insulation was obtained; thereafter, many succeeded.

Plaintiffs make no proffer of what part of the commercial success of metallic resist methods is attributable to satisfactory bonding; and what part is attributable to the Signal Corps disclosures at a time when Eisler did not have pending any claims in '697 for metallic resist methods as such.

(9) Obviousness—person of ordinary skill in the art.

Plaintiffs assert that evidence was offered in the Chicago case that in 1943–

7. Original claim 4 of '960 was similar to claim 4 in '967, but was cancelled before issuance of '960. See 218 F.Supp. 16, 45–46.

8. 218 F.Supp. at 15–18, 45–46; 164 U.S. P.Q. at 587.

44 it would not have been obvious to a person of ordinary skill in the electrical art to make a bimetallic conductive pathway pattern on insulation for a component of an electric and "magnetic" circuit system as set forth in claim 10 of '697; and that it was not obvious to the witness personally.

(a) No effort is made to explain why this testimony, if relevant, could not have been offered in Bendix.

(b) The value of the testimony of the witness is materially affected by his rather evasive answer to the question as to whether it would have been obvious in view of the prior art—"Littledale, Parolini, Paragon, the whole kit and caboodle"—for a person of ordinary skill in the art to produce "an interconnecting network for making electric circuits by the steps described in Claim 10 of '697". His reply was that it would be a difficult question to answer; that he did not think such person would come up with the answer unless he was "guided in a specific direction."

So far as this Court is advised, the witness was not asked how he thought the Signal Corps had arrived at its solution; or why it was not until after the Signal Corps had announced its solution, that Eisler filed his application that became Claim 10.

(10) Evidence of level of ordinary skill in the electrical art.

Plaintiffs' expert testified in the Chicago case that the level of ordinary skill in the electrical art in the period 1940–1944 "would be just under that of a man with a bachelor's degree in engineering," which would include "a year, or a half year of chemistry" at college level.

Plaintiffs argue that similar testimony was not offered in Bendix, and that therefore the requirements of Graham v. John Deere Co., 383 U.S. 1, 18–19, 86 S. Ct. 684, 15 L.Ed.2d 545 (1966), were not met.[9]

(a) Why, if significant this, or its equivalent, could not have been offered in Bendix is not mentioned.

(b) The Court is not advised of the basis upon which the witness could possibly have reached the conclusion expressed, or whether it was or ever had been shared by anyone else; or ever expressed prior to the Chicago litigation.

(c) The definition, if sound, is unrevealing. It leaves completely unanswered the real question—what would a person with skill "just under that of a man with a bachelor's degree in engineering" know about "the art of producing interconnecting networks for making electrical circuits." Certainly not every such Bachelor of Engineering would have been interested in this field.

Would he have made any patent search? Would his college education have acquainted him with the "print and etch" field? Unless he were specifically employed in research, or interested in independent invention, why and how much would he know of and in this field? Is not the level of ordinary skill in the art demonstrated by the actual accomplishments of the art?

(d) Moreover, the advocacy of plaintiffs' witness is clearly demonstrated.

The witness's affidavit in part stated:

"I have read the specifications of each of Eisler Patents 2,441,960, Re 24,165, and 2,706,697, and have read the claims of each in the light of the specification. The claims are clear, distinct, certain and fully operative to a person skilled in the electrical and electronics art when interpreted in the light of the specifications . . ."

Such blanket endorsement gives blessing to Claim 5 of '697 and the claims of the '165 patent and Claims 1, 2, 3 and 7 of the '960 patent, found by this Court to be inoperative (218 F.Supp. 43–44); to Claims 4, 10, 13 and 14 of '697 as to which Commissioner Davis found the disclosures of the specifications of '697

9. Further discussed under Point B, infra.

inadequate (164 U.S.P.Q. 587–589); and the use of the terms "foil", "printing", and "component." (218 F.Supp. 38–43).

Further, in material presented to this Court before the Blonder-Tongue decision, for the purpose of supporting the argument that a person skilled in the art would have no difficulty in carrying out the steps in '697, this same witness gave no such unqualified endorsement of clarity as that quoted above. What he then is quoted as saying is:

"I mean that a person skilled in the art can follow the claims and the specifications and come up with what presumably, at any rate, is the intent of the inventor. I suppose it is difficult to say with complete assurance what the intent of the inventor is, but you can come up with a result that satisfies a person as being what the inventor meant." [10]

This would appear to be a rather devious way of characterizing the claims as "clear, distinct, certain." Moreover, the language last above quoted would seem to envisualize a patent for a product, rather than one restricted to method claims.

(11) Rubin

(a) The Rubin patent, No. 2,443,119, issued June 8, 1948 on application filed April 5, 1944, was before the court in Bendix (218 F.Supp. 18–19). Whatever arguments could be made therefrom could have been made in that case.

(b) Rubin disclosed and used the common cathode for the deposition of the same metal in discontinuous areas for reinforcement.

(c) Reference is made to Rubin notes prepared in September 1943. These were before the Court of Claims and Rubin was a witness. (164 U.S.P.Q. at 590). Presumably every conceivable argument with respect thereto was made, without success, before Commissioner Davis.

(d) However much present counsel seek to disparage Rubin, his patent, and

his works, Technograph thought enough of the Rubin patent to purchase it on July 7, 1954 for 1500 shares of Technograph's common stock. This was only shortly before office action of December 8, 1954, rejecting all claims of '697 on Rubin as a statutory bar for failure to copy the Rubin claims. Per custom, the rejection was short lived (218 F.Supp. 17–18).

(B) The Court did not fail to apply the John Deere Co. standards.

In Graham v. John Deere Co., 383 U. S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966) the Court said:

". . . Under § 103, the scope and content of the art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented . . ."

The Court continued (p. 19, 86 S.Ct. p. 694):

". . . The standard has remained invariable in this Court. Technology, however, has advanced—and with remarkable rapidity in the last 50 years. Moreover, the ambit of applicable art in given fields of science has widened by disciplines unheard of a half century ago. It is but an evenhanded application to require that those persons granted the benefit of a patent monopoly be charged with an awareness of these changed conditions. The same is true of the less technical, but still useful arts. He who seeks to build a better mousetrap today has a long path to tread before reaching the Patent Office."

Plaintiffs seem to urge that the Court's decision on obviousness was

---

10. Transcript on hearing on motions to dismiss, July 29, 1969, pages 98–99.

purely subjective because no witness in so many words described the alleged Eisler inventions as obvious.[11]

That direct testimony is not necessary to sustain a finding of invalidity is stated, with his usual forcefulness and lucidity by Judge Learned Hand in Kohn v. Eimer, 265 F. 900, 902 (2 Cir.1920), quoted with approval in General Motors Corp. v. Estate Stone Co., 203 F.2d 912, 914–915 (6 Cir.1953); and to the same effect, B. F. Goodrich Co. v. Rubber Latex Products, Inc., 400 F.2d 401, 406 (6 Cir.1968).

Indeed, the Supreme Court in John Deere did not rely upon, or state the need or the necessity for, such testimony.

The same contention was unsuccessfully advanced in plaintiffs' Motion in the Fourth Circuit for Reargument en banc. It was again advanced equally unsuccessfully, in plaintiffs' Petition to the Supreme Court for certiorari.

In arriving at its conclusions as to obviousness, the Court considered:

(a) The prosecution history of the application maturing into the patents in suit,[12] including an examination and analysis of fifteen patents cited by the Patent Office;

(b) An analysis of fifteen additional patents and prior art not cited by the Patent Office, some of which were more pertinent than the cited art;

(c) The testimony of defendant's expert witness comparing the Eisler methods with the methods described in the prior art;

(d) The testimony of independent developers of the same methods recited in the claims of the patents in suit;

(e) Testimony that the commercial success of processes using a metal coated insulating material was attributable to the development of a satisfactory raw material of adequate bonding characteristics, rather than to any disclosure of Eisler;

(f) The recognition by Eisler that the "production of the metal electric and magnetic conductors in position upon their insulating support" was based upon "printing" ('697, col. 1, Lines 45–48); that "A typical instance of the invention comprises the steps of preparing by any of the well-known methods of the printing art, a printing plate . . ." ('697, col. 1, lines 57–59); and that "The sheet is then etched in the well-known manner of the printing art . . . ." ('697, lines 22–23);

(g) In the course of the prosecution of the '697 patent, Eisler's attorneys in an answer dated July 21, 1954 admitted that the individual steps could be found in the references, although it is claimed that they are in different combinations. It is further admitted that "there is no problem to produce and [sic] insulation backed conductive pathway pattern. The unwanted areas of metal foil may be removed by cutting, stamping, etc.; and the pattern may be drawn by hand with a conductive paint on an insulation layer and then be built up by electroplating . . . ."[13]

(h) The Court is criticized[14] for not purporting to discuss the "question of whether it was obvious for a person of ordinary skill in the electrical art to look to the art of making printing plates and the art of ornamenting metals in the early 1940's for producing bimetal conductive pathway patterns for electrical components." In view of Eisler's concessions (paragraph (f) of this Part B) as to the preparation of the "printing plate" by "any of the well-known methods of the printing art" and to etch in the "well-known methods" of the same

11. Had such testimony been offered, plaintiffs probably would have objected on the ground that the witness was usurping the functions of the court; that the court must decide from the *testimony* as to the prior art and the Eisler disclosures, and not from the conclusion of a witness.

12. Specifically, as to '697, see 218 F.Supp. at 15–18.

13. Bendix, defendant's Exhibit 491, p. 77.

14. Brief, 26.

art, it would have been supererogation to repeat the significance, and availability, of what was well-known.

As to the metallic resist aspect, the Newton, Stubbles, McFarland, Dejey and Payne patents are discussed at pages 37–38 of 218 F.Supp., but not by the Patent Office Examiner. Newton called for a photomechanical resist which prevented etching, or electro-deposition. Stubbles used a photomechanical negative resist pattern, nickel being deposited upon the unprotected surface, and serving as a metallic resist. McFarland used metal as a plating and a resist. Dejey employs an additive metallic resist. Payne's patent used the very words "metal resist".[15] Newton, Payne, Dejey and Stubbles are discussed by Commissioner Davis in Finding 17(a) and (b), and in "Summing up" in Finding 23, he concludes:

> "In view of the state of the art showing that printing-art practices were commonly used in the electrical and metal-working arts, it was within ordinary skill to use the old 'two resist' process to make electrical components from foil-clad insulation." [16]

The foregoing (except Commissioner Davis' Findings) and the entire record, was considered by this Court in reaching its conclusion that '697 was invalid for obviousness. It stated (218 F.Supp. at 31):

> "Should another court find that the alleged Eisler inventions were not identically disclosed or described in the Stevens and Dallas [17] application, this court unhesitatingly finds and holds that 'the differences between the subject matter sought to be patented and the prior art' were 'such that the subject matter as a whole would have been obvious at the time the [alleged] invention[s] [were] made to a person having ordinary skill in the art to which said subject matter pertains' (35 U.S.C. § 103). The court holds

that the Stevens and Dallas application—not considered by the Examiner—of itself invalidates the Eisler patents, either as an anticipation, or as showing lack of novelty.

"Even apart from the Stevens and Dallas application the court holds that the other prior art, cited and uncited by the Examiner conclusively shows lack of novelty."

\* \* \* \* \* \*

". . . When the available literature, both patents and publications, not cited, is considered, and also the ability of persons unaware of the alleged inventions to reach the same results by the same means, the court has no hesitation in holding the patents, and the claims in suit to be invalid." (218 F.Supp. at 24).

\* \* \* \* \* \*

". . . Many were working at about the same time as Eisler on printing and etching techniques. None succeeded commercially until a satisfactory bonding of metal to insulation was obtained; thereafter, many succeeded." (218 F.Supp. at 52).

The Signal Corps success with good bonding materials has been noted.

In addition, plaintiffs' newly employed patent attorney, Frederick E. Hane, in connection with the filing on January 13, 1953, in the Patent Office of an amendment in the '697 application, including claims not reciting the step of transferring a circuit pattern to an insulating support, wrote to plaintiffs' British patent agent a deeply significant explanatory letter. In part, it reads:

> "Please find enclosed a copy of the amendment which I have filed in answer to the office action due on January 14, 1953 after approval by [plaintiffs' Vice President]. As you will note, I have added claims 11, 12 and 13 in which the transfer step has been omitted. These claims have been pre-

---

15. Whilems, and Norris, 2, 282, 203 are considered under Point C, infra.

16. Pages 32 and 37 of printed opinion in Technograph, etc. et al. v. United States.

17. See Point (C), infra.

pared in an attempt to cover *competitive products now here on the market* which use all steps except the transfer step." [18] (Emphasis supplied).

This Court in 1963 was, and to-day is, of the opinion that the record in this case fully justified the conclusion that the Eisler patents, including '697, were and are invalid under U.S.C. Title 35, § 103, for obviousness. This Court is further of the opinion that its statement that "the claim of indefiniteness strongly supports, if alone it would not require, the finding of invalidity" (218 F. Supp. at 43) is at least as valid today as when first written.[19] A study of the Blonder-Tongue decision in no wise changes these conclusions.

(C) This is not " 'one of those relatively rare instances where the courts wholly failed to grasp the technical subject matter and issues in suit' . . . *as to patent '697."* (plaintiffs' emphasis).

While this Court vigorously disagrees with plaintiffs' statement to the contrary, it will endeavor to give objective consideration to the points urged by plaintiffs' counsel in support thereof.

1. It is suggested by counsel that '697 was in effect buried by '960 and '165. Since the specifications of '165 and '697 are substantially verbatim those of '960 [20] and as '165 and '697 are derived from divisions of the application maturing into '960, much of the analysis of the specifications, and procedures in the Patent Office was common to, or at least relevant to, all three. The positions of the parties with respect to each of the patents was recognized (218 F. Supp. 6–7); the individual Patent Office history of '697 was discussed (218 F.Supp. 15–18); special references to '697 are made with respect to "foil" (218 F.Supp. 39–40); "printing" (218

F.Supp. 40); and "component" (218 F. Supp. 42).

Separate attention was also given to claims for inoperative procedures in '697 (218 F.Supp. 43–44); to the contention of "intervening rights and laches" (218 F.Supp. 45–46); and to questions of infringement (218 F.Supp. 53–54).

If "plaintiffs presented '697 as the tail on the dog" [21] the Court gave the entire dog consideration as such; and independent consideration to the appendage as such.

(1) Alleged "incorrect findings."

Plaintiffs refer to a letter from an attorney (now deceased) to his client, not involved in the Bendix litigation, that counsel for Bendix had said that "they found incorrect findings in the Watkins decision." The only "finding" to which direct reference is made is:

(a) The statements made by the court with respect to the Stevens and Dallas Application Serial Number 184,419, filed January 11, 1938. The following references were made:

"Clearly, electroplating to reinforce, or to serve as a resist, is disclosed." (218 F.Supp. 25).

Plaintiffs' Brief [22] then makes two partial quotations, in reverse order, from page 31 of 218 F.Supp., omitting the qualifications and alternative approaches considered by the court. Although much of this has been quoted before, plaintiffs endeavor to make so much of the partial, reversed, quotations, that the full text is given below:

"To the court the Stevens and Dallas application seems to be a complete anticipation under 35 U.S.C. § 102(b) in that the alleged Eisler inventions were described in such application, more than a year prior to the date of the application for any of the Eisler patents. Having been referred to by Ste-

18. Commissioner Davis' Finding 27, page 40 of printed opinion in Technograph, etc. et al. v. United States.

19. See 164 U.S.P.Q. at pages 587–589; printed opinion, pages 7–10.

20. See 218 F.Supp. at 5, 65.

21. Plaintiffs' Brief, p. 5.

22. Page 19.

vens and Dallas in the specifications in Patent No. 2,219,497, the application became part of the disclosure set out in said patent (Application of Heritage, C.C.P.A.1950, 182 F.2d 639, 643, 37 CCPA 1109; B. F. Goodrich Co. v. United States Rubber Co., D.C. D.Md.1956, 147 F.Supp. 40, 58, affirmed 4 Cir., 1957, 244 F.2d 468, 470).

"Should another court find that the alleged Eisler inventions were not identically disclosed or described in the Stevens and Dallas application, this court unhesitatingly finds and holds that 'the differences between the subject matter sought to be patented and the prior art' were 'such that the subject matter as a whole would have been obvious at the time the [alleged] invention[s] [were] made to a person having ordinary skill in the the art to which said subject matter pertains' (35 U.S.C. § 103). The court holds that the Stevens and Dallas application—not considered by the Examiner—of itself invalidates the Eisler patents, either as an anticipation, or as showing lack of novelty.

"Even apart from the Stevens and Dallas application the court holds that the other prior art, cited and uncited by the Examiner conclusively shows lack of novelty." (218 F.Supp. 31; see also the language at pages 24 and 52 of 218 F.Supp., quoted in (B) (h) supra.

Conceding that classing Dallas and Stevens as anticipatory of all three patents was too broad, nevertheless the court, in the quotation above, recognized the possibility of difference of opinion, and held that the totality of the evidence, including Dallas and Stevens, established invalidity on the basis of obviousness.

The Fourth Circuit was not misled. Counsel for Bendix frankly stated to the Fourth Circuit that if this Court's statement was interpreted to mean that the Stevens and Dallas application disclosed the negative imprint, metallic resist method of '697, he would have to disagree. This disclaimer must have been understood by the Fourth Circuit.

It did not affirm on the ground of anticipation.

It did not affirm simply "on the opinion below".

The affirmance was:

"After careful consideration of the record, the arguments and the briefs of counsel, we are persuaded that the patent claims are invalid for *obviousness* in the light of the prior art for the reasons fully discussed in the opinion of the District Court. Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., D.C.Md., 218 F. Supp. 1)." (emphasis added. 327 F. 2d 497, 498, 4 Cir. 1964).

In their Petition for Rehearing En Banc, the main contention of plaintiffs was with respect to the lack of an objective basis for a finding of obviousness. However, the Stevens and Dallas contention was twice urged,[23] and it was forcefully urged that accordingly "it is hard to see how this Court could have affirmed merely on the *ratio decidendi* of the lower court, at least as regards Patent '697".

The Fourth Circuit, fully advised, adhered to its ruling.

(b) "The Court in *Bendix* apparently believed that Whilems[24] taught more than it did."[25]

Reference is made to this Court's language on page 37 of 218 F.Supp., but not to that on page 32, which is a direct quotation from the patent.

Whilems is significant:

(i) It teaches the use of a negative representation resist "which serves during a subsequent step, to prevent the

23. Pages 2, 4.

24. British Patent 454,937, provisional Application filed April 8, 1935; Complete Specification Accepted October 8, 1936.

25. Plaintiffs' Brief, page 12.

transfer of metal to, or the removal of metal from, the parts of the sheet covered by the resist and thereafter removing the resist."

It is true that the reference is in connection with an insulating sheet. However, Eisler in '697 states [26] that:

"It will be seen below that it is not essential that the imprint be positive, nor that the imprint be made on metal, nor that the component be developed by the removal of metal."

(ii) In the second method taught by Whilems, the insulating sheet is covered by metal, and "a resist in the form of *separate elements* is then formed on the metal coating . . ." [27] (Emphasis supplied)

(iii) The protection of the resist from the etching reagent through the use of greasy inks is taught by Whilems [28] and by Eisler.[29]

(c) Norris, 2,282,203.

Plaintiffs contend that Norris 2,282,203 was the equivalent of Newton, Stubbles, McFarland, Dejey and Payne, not mentioned in the prosecution of any of the Eisler patents; and that Norris '203 must have been considered by the Examiner in the prosecution of '697, although not cited by him.

Four times in plaintiffs' Main Brief [30] and three times in plaintiffs' Reply Brief [31] it is asserted that Norris "must" have been considered and rejected by Examiner Sylvester in the prosecution of '697, because Sylvester was also the Examiner in '690, in which Norris '203 was cited. Sylvester's acquaintance with Norris '203 was, however, much more attenuated than plaintiffs' Main Brief and Reply Brief would indicate. In the status conference of May 27, 1971, the teaching of Norris '203, and the relationship of Examiner Sylvester was advanced for the first time. Counsel for plaintiffs stated:

"Your Honor correctly described one of the processes [of Norris '203] in your opinion, but Your Honor did not describe the other process, and I don't even think it was presented to Your Honor.

"The other process was, in effect, the equivalent of—and, excuse me, going back, Norris –203 was for making something like a printing plate, so it was in fact that same kind of area as Newton, Dejey, and Payne. The other process was in *using a metallic resist*, and the Examiner had this patent on –960, and it was the same Examiner on –960 as on –697.

"It is true that the Examiner came in on the –960 prosecution after Norris –230 had been cited, but in introducing himself to that particular situation, he studied all the prior art, so he knew about Norris –203, and cited it against –960.

"I think it a fair assumption that when he came to –697, and it was the same Examiner, Sylvester, that he knowingly rejected, or at least considered and rejected even though there was no citation to it. Norris –203, which was a *metallic resist* but for making printing plates." [32] (All emphasis supplied).

Norris '203 had two processes, one described by this Court in 218 F.Supp. at 10–11. In the modification,[33] the nickel screen is completely covered by copper; a sensitized coat is applied directly on the copper; a negative of the design is printed and developed. By an "electro-forming operation" a layer of nickel is deposited on the exposed copper; the hardened coat is removed, followed by an etching process of the thus exposed copper that does not affect the

26. Col. 5, lines 1–4.

27. Page 3, lines 56–58.

28. Page 4, lines 1–5.

29. Col. 4, lines 26–32.

30. Pages 6, 16, 17, 18–19.

31. Pages 7, 10, 13.

32. Pages 144–145.

33. Page 2, col. 2, lines 64–75 to page 3, col. 1, line 21.

deposited nickel or the nickel of the screen. The etching is carried through the copper.

Had the Examiner in '697 had this deposited metallic resist in mind, he could not have ignored it, and certainly would have cited it. It is a print-deposit-etch procedure, the deposit representing, and protecting, the design. This, of course, was critical as to '697. It is incredible that if the Examiner had considered Norris '203 he would not have made it of record. He did not even mention it (or Newton, Dejey, Payne, Stubbles and McFarland).

(d) The House of Lords Decision.

Plaintiffs assert that the decision of the House of Lords on February 24, 1971, in Mills and Rockley (Electronics) Limited v. Technograph Printed Circuits Limited, upholding the validity of Eisler English Patent No. 639,178, "should be given, *at least as much weight* as the affirmed Bendix decision . . ." (Emphasis supplied). It is stated that the English patent involved the print and etch technique which is close to Eisler's American Patent Reissue '165. Importantly, plaintiffs say that "Both the English patent and all three American patents, including '697, were derived from the same complete specification."

With deference to plaintiffs' counsel, and to the House of Lords, this Court does not agree.

(1) The only American patent considered by the Lords was O'Connell. This Court does not agree with the analysis of O'Connell accepted by the Lords. See 218 F.Supp. 1, 34–35.

(2) The House of Lords did not refer to Dallas and Stevens, or to the Bendix decisions, in the District Court or in the Court of Appeals, or to any other of the cited American patents.

(3) In the English case the defendant did not offer expert testimony;[34] in fact, it did not offer *any* testimony.[35]

(4) In "the absence of any evidence to the contrary", plaintiff's expert's testimony that O'Connell did not give him any help at all, should be accepted conclusively.[36] In the absence of impeaching cross-examination or contrary evidence, Lord Diplock said: "In the absence of any such material I do not think that your Lordships are entitled in so technical a field to reject this uncontradicted expert evidence." [37]

(5) At least a grave doubt of the appreciation of the Lords as to what the English patent was "all about", apart from the willingness to rely implicitly and entirely on expert testimony, is found in Lord Wilberforce's paean of praise:

"This comparatively simple formula ["print" and etch] describes what has undoubtedly brought about a manufacturing revolution. One has only to contrast an old fashioned radio or television set with its complicated three-dimensional network of wiring (point to point) with the clean *two-dimensional elegance* of a printed circuit to see how complete this was." [38] (Emphasis supplied).

Even Eisler, not overly modest, made no such extraordinary claim. While his circuits were thin, his methods did not eliminate copper, but brought "the metal conductor of the circuit component into existence in its final form, or in a development of that form *upon* a plane or cylindrical surface." [39]

---

34. Lord Reid, page 3. Reference is to the reproduction of the printed opinion, identical copies having been furnished the Court by each side.

35. Lord Wilberforce, page 5.

36. Lord Reid, page 4.

37. Page 9.

38. Page 5. While even the Staff of the Federal Power Commission cannot "say for certain just how electricity is really transmitted" (Federal Power Commission v. Florida Power & Light Co., 404 U.S. 453, 92 S.Ct. 637, 047, 30 L.Ed.2d 600 footnote 22), power companies and manufacturers of electric appliances use three dimensional transmission lines.

39. '960 Specification, Col. 1, lines 46–49; '697 Specification, Col. 1, lines 53–55 (Emphasis supplied).

(6) This Court strongly doubts that plaintiff, while enthusiastically welcoming the holding of validity, would accept the determination by the House of Lords of the scope of the English patent (bearing in mind that "Both the English patent and all three American patents, including '697, were derived from the same complete specification").

(a) It is limited to the use of a "printing plate", which was held to include "a kind of stencil referred to as a silk screen".[40]

(b) ". . . upon the true construction of the specification read as a whole the claim is limited to a method in which a 'printing plate' is used to produce an impression in resist *ink* of the pattern of the circuit upon the metal surface of the laminated sheet. This no doubt *excludes photo-chemical methods* as well as die stamping. . . ."[41] (Emphasis supplied).

(7) Present patent counsel for plaintiffs has withdrawn the '960 and '165 patents from this litigation, practically admitting their invalidity. He stated that "while [prior] patent counsel may have believed these patents were valid, that they were certainly very close patents to the prior art . . ."[42]

Of course, the House of Lords was not concerned with the further problems with respect to '697—whether the specifications disclose the "metallic resist" process or method. See Bendix, 218 F. Supp. 1, 15–18; 45–46; Commissioner Davis, 164 U.S.P.Q. 584, 587–589.

After a review of the Bendix case, and of plaintiffs' Briefs and Exhibits tendered herein, this Court does not believe that either it, or the Fourth Circuit Court of Appeals failed to grasp or understand the problems presented, or "the technical subject matter and issues in suit", or the evidence with respect thereto.

* * *

(E) The allowance of the pleas of estoppel is just and equitable.

In substance, present patent counsel argue that prior patent counsel failed adequately to enlighten the court (and, presumably, that this Court's independent efforts likewise did not effect such enlightenment). An ad hominem reply would be that present counsel has likewise failed in this respect. Change of counsel, although it may effect a different approach, cannot affect the existence of facts, the nature of outstanding patents, or literature in the field involved. Eisler frequently changed his patent attorneys with astounding (but undeserved) success in the Patent Office. That has not been true in the courts.

In Bendix, local counsel were the same as local counsel in these cases.

In Bendix, present patent counsel's senior partner was on the brief of appellants in the United States Court of Appeals for the Fourth Circuit, and on the brief of appellants in their Petition for Rehearing En Banc.

Plaintiffs' present patent counsel was "of counsel" in the Court of Claims case. 164 U.S.P.Q. 584, 585.

Plaintiffs had their "day" (or weeks) in court, in what was described by their counsel as "a test case."[43] They have been unable to persuade Commissioner Davis of the Court of Claims, on presumably the arguments advanced and evidence tendered here, that '697 is valid. They have likewise been unable to convince this Court that '697 is valid, or that a further trial would result in a different decision; or that the chances thereof are sufficient to justify the time and expense of an additional trial.

This Court is satisfied beyond a reasonable doubt that considered "in a

---

40. Lord Reid, pp. 4–5; Lord Diplock, p. 10.

41. Lord Diplock, p. 10.

42. Informal status conference of 5/27/71, pages 124–125.

43. Petition for Rehearing En Banc, page 1.

principled way . . . it is just and equitable to allow the plea[s] of estoppel in the case[s] before it." [44]

The pleas of estoppel are sustained, and the cases are dismissed.

44.   402 U.S. 313, 334, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788.