474 F.2d 798
 177 U.S.P.Q. 97
 TECHNOGRAPH PRINTED CIRCUITS, LTD., and Technograph Printed
Electronics, Inc., Plaintiffs-Appellants,
v.
MARTIN-MARIETTA CORPORATION, Defendant-Appellee.
TECHNOGRAPH PRINTED CIRCUITS, LTD., and Technograph Printed
Electronics, Inc., Plaintiffs-Appellants,
v.
WESTINGHOUSE ELECTRIC CORPORATION, Defendant-Appellee.
TECHNOGRAPH PRINTED CIRCUITS, LTD., and Technograph Printed
Electronics, Inc., Plaintiffs-Appellants,
v.
McDONNELL AIRCRAFT CORPORATION, Defendant-Appellee.
TECHNOGRAPH PRINTED CIRCUITS, LTD., and Technograph Printed
Electronics, Inc., Plaintiffs-Appellants.
v.
INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Defendant-Appellee.
 Nos. 72-1597 to 72-1600.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 1, 1972.
Decided Feb. 20, 1973.
 
 Sidney Bender, New York City (Aaron Lewittes, Leventritt, Lewittes & Bender, New York City, on brief), for plaintiffs-appellants.
 Edward F. McKie, Jr., Washington, D. C. (Benjamin C. Howard and Miles & Stockbridge, Baltimore, Md., on brief), for defendant-appellee, Martin-Marietta Corp.
 William E. Schuyler, Jr., Schuyler, Birch, Swindler, McKie & Beckett, Washington, D. C., on brief, for defendant-appellee, Westinghouse Electric Corp.
 Jervis Spencer Finney, Ober, Grimes & Shriver, Baltimore, Md., Charles H. Walker, Albert E. Fey and Fish & Neave, New York City, on brief, for defendant-appellee, McDonnell Aircraft Corp.
 Dana M. Raymond, Brumbaugh, Graves, Donohue & Raymond, New York City, Norwood B. Orrick and Venable, Baetjer & Howard, Baltimore, Md., on brief, for defendant-appellee, International Telephone and Telegraph Corp.
 Before BUTZNER, FIELD and WIDENER, Circuit Judges.
 WIDENER, Circuit Judge.
 
 
 1
 These cases arose when the plaintiffs (appellants) filed patent infringement suits against the defendants (appellees) in the United States District Court for the District of Maryland. The plaintiffs are, respectively, the owner and exclusive licensee under Eisler's United States Patent No. 2,706,697 ('697).[1] The complaints allege that the defendants infringed Claims 4 and 10-14 inclusive of '697. The defendants pleaded collateral estoppel, claiming that the same issues before the court had been adversely decided against the plaintiffs in Technograph Printed Circuits, Ltd. v. Bendix Aviation Corporation, 218 F.Supp. 1 (D.Md.1963), aff'd. 327 F.2d 497 (4th Cir. 1964), cert. den. 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36 (1964) (hereinafter Bendix). The district court sustained the defendants' pleas of estoppel and dismissed the cases.[2] We affirm on the authority of Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).
 
 
 2
 In Blonder-Tongue, the Supreme Court granted certiorari following a conflict between the Seventh and Eighth Circuits as to the validity of the patent there in question. The Eighth Circuit had previously held the patent invalid in a suit by the Foundation as plaintiff against another defendant. The Seventh Circuit, in a suit by the Foundation as plaintiff, found the patent to be valid and infringed by Blonder-Tongue Laboratories. The court did not determine the issue of validity but overruled Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936), insofar as it foreclosed a plea of estoppel by judgment by a defendant facing a charge of infringement of a patent brought by a plaintiff which had previously, as a plaintiff, had the patent declared invalid in litigation concerning the validity of the patent.[3] The court abolished the doctrine of mutuality of estoppel in such patent cases. It held that a plea of estoppel by judgment could be affirmatively asserted by a defendant where the issue decided in the prior adjudication was identical with the one presented in the present action, where there was a final judgment on the merits in the prior case, and where the party-plaintiff against whom the plea was asserted was a party-plaintiff, or was in privity with such party-plaintiff, who received the adverse decision in the prior adjudication. The following excerpt from the opinion is the best expression of the court's reasoning and explains the standards to be followed in determining whether or not such a plea of estoppel should be sustained:
 
 
 3
 "Even conceding the extreme intricacy of some patent cases, we should keep firmly in mind that we are considering the situation where the patentee was a plaintiff in the prior suit and chose to litigate at that time and place. Presumably he was prepared to litigate and to litigate to the finish against the defendant there involved. Patent litigation characteristically proceeds with some deliberation and, with the avenues for discovery available under the present rules of procedure, there is no reason to suppose that plaintiff patentees would face either surprise or unusual difficulties in getting all the relevant and probative evidence before the court in the first litigation.
 
 
 4
 "Moreover, we do not suggest, without legislative guidance, that a plea of estoppel by an infringement or royalty suit defendant must automatically be accepted once the defendant in support of his plea identifies the issue in suit as the identical question finally decided against the patentee or one of his privies in previous litigation. Rather, the patentee-plaintiff must be permitted to demonstrate, if he can, that he did not have 'a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time.' Eisel v. Columbia Packing Co., 181 F.Supp. 298, 301 (D.C.Mass.1960). This element in the estoppel decision will comprehend, we believe, the important concerns about the complexity of patent litigation and the posited hazard that the prior proceedings were seriously defective.
 
 
 5
 "Determining whether a patentee has had a full and fair chance to litigate the validity of his patent in an earlier case is of necessity not a simple matter. In addition to the considerations of choice of forum and incentive to litigate mentioned above, certain other factors immediately emerge. For example, if the issue is nonobviousness, appropriate inquiries would be whether the first validity determination purported to employ the standards announced in Graham v. John Deere Co., supra [383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545]; whether the opinions filed by the District Court and the reviewing court, if any, indicate that the prior case was one of those relatively rare instances where the courts wholly failed to grasp the technical subject matter and issues in suit; and whether without fault of his own the patentee was deprived of crucial evidence or witnesses in the first litigation. But, as so often is the case, no one set of facts, no one collection of words or phrases, will provide an automatic formula for proper rulings on estoppel pleas. In the end, decision will necessarily rest on the trial courts' sense of justice and equity.
 
 
 6
 "We are not persuaded, therefore, that the Triplett rule, as it was formulated, is essential to effectuate the purposes of the patent system or is an indispensable or even an effective safeguard against faulty trials and judgments. Whatever legitimate concern there may be about the intricacies of some patent suits, it is insufficient in and of itself to justify patentees relitigating validity issues as long as new defendants are available. This is especially true if the court in the second litigation must decide in a principled way whether or not it is just and equitable to allow the plea of estoppel in the case before it." (Footnotes omitted.)
 
 
 7
 402 U.S. at 332, 91 S.Ct. at 1444.
 
 
 8
 The first issue here is whether the parties-plaintiff in the present cases are the same parties-plaintiff as in Bendix. In Bendix, the plaintiffs were Technograph Printed Circuits, Ltd., and Technograph Printed Electronics, Inc. The plaintiffs in the present cases are Technograph Printed Circuits, Ltd., and Technograph Printed Electronics, Inc. Thus, the parties-plaintiff are the same in both instances and the requirement of Blonder-Tongue that the parties-plaintiff be identical or in privity has been met.
 
 
 9
 We turn to the next requirement of Blonder-Tongue: that the issues in both proceedings be identical. In Bendix, the district court held that claims 4, 5, 10, 14, 15, and 16 of '697 and certain claims of '165 and '960 were invalid for obviousness and anticipation. 218 F.Supp. 1, 31, 58. In the present appeal, no issue is raised concerning '165 or '960. Plaintiffs claim only that claims 4 and 10-14 inclusive of '697 were infringed by the defendants. Although it appears that the validity of claims 11, 12, and 13 of '697 were not specifically mentioned as being invalid in Bendix, an examination of those claims shows that they were dependent on claim 10,[4] which was held invalid in Bendix. Also, the trial court's opinion states that the parties here conceded that the issues in suit were identical to the issues decided against plaintiffs in Bendix (340 F.Supp. 423, 425), and this is not contested on appeal. Accordingly, the requirement of Blonder-Tongue that the issues be identical in both proceedings has been complied with.
 
 
 10
 The next step in determining whether Blonder-Tongue should apply is to ascertain whether plaintiffs were given a full and fair opportunity, procedurally, substantively, and evidentially, to litigate the validity of '697 in Bendix. We conclude that they were.
 
 
 11
 The Bendix trial took twenty-nine court days, during which the plaintiffs filed 458 exhibits and the defendants 543 exhibits. Several additional days were spent by the court in visiting the plants of Bendix and of licensees of the plaintiffs. Following the last day of trial, the parties filed additional briefs, over 600 pages, followed by two days of argument. No claim was made then, nor is any made now, that the court, in Bendix, excluded any relevant evidence that was offered.
 
 
 12
 In its decision in Bendix, the district court discussed the background of Dr. Paul Eisler, the applicant in '697.[5] The court continued by setting out the claims in issue and the positions taken by the parties to the suit.[6] The court then traced, in a painstakingly detailed process that need not be repeated here, the history of the three Eisler patents in the Patent Office.[7]
 
 
 13
 In discussing the issue of validity, the court recognized the statutory presumption of validity of a patent from the fact of its issuance and that the burden on one attacking the validity of the patent is heavy. Bendix, 218 F.Supp. at 23. The court also recognized that the presumption of validity was weakened by the failure of the Examiner to cite a number of patents pertinent to the validity of plaintiffs' patents in issue. Bendix at 23. It then considered the state of the art prior to, and at the time of, Eisler's claimed inventions. In discussing the state of the prior art, the court not only considered those patents considered by the Examiner in the prosecution of the Eisler patents,[8] but also patents not mentioned by the Examiner, which the court felt were pertinent to the validity of Eisler's patents. Concerning the metallic resist claim of '697, the court said that patents by Newton, Stubbles, McFarland, Dejey, and Payne were not cited by the Examiner, but that they clearly disclosed a metallic resist concept. Bendix at 37. Patents which were before the court and which were considered by it with respect to the Eisler patents were: Stevens and Dallas application No. 184,419, incorporated by reference in Stevens and Dallas Patent No. 2,219,497; Bassist, Patent No. 1,525,531; Miller, Patent No. 1,804,021; Pilkington, British Patent No. 461,275; Whilems, British Patent No. 454,937; Littledale, British Patent No. 327,356; O'Connell, Patent No. 2,288,735; the Russian Patent 59,791 to Abramson and Kabakova and the article published by them in 1940; Ducas, Patent No. 1,563,731; Norris, Patent No. 2,282,203; and Rubin, Patent No. 2,443,119, as well as others. See Bendix, supra, 218 F.Supp. 1.
 
 
 14
 The district court considered the Stevens and Dallas application to be a complete anticipation of the alleged Eisler inventions. But the court did not stop there; it continued, saying:
 
 
 15
 "Should another court find that the alleged Eisler inventions were not identically disclosed or described in the Stevens and Dallas application, this court unhesitatingly finds and holds that 'the differences between the subject matter sought to be patented and the prior art' were 'such that the subject matter as a whole would have been obvious at the time the (alleged) invention(s) (were) made to a person having ordinary skill in the art to which said subject matter pertains'." (35 USC Sec. 103)
 
 
 
 * * *
 "Even apart from the Stevens and Dallas application the court holds that the other prior art, cited and uncited by the Examiner conclusively shows lack of novelty." 218 F.Supp. at 31.
 It found as a fact that the progress of printed circuitry was attributable to the development of a satisfactorily bonded metal clad laminate rather than any gain in the knowledge of the printing and etching of metals. The court said: ". . . many were working at about the same time as Eisler on printing and etching techniques. None succeeded commercially until a satisfactory bonding of metal to insulation was obtained; thereafter, many succeeded." 218 F.Supp. at 52.
 Throughout the district court's opinion in Bendix, there is shown painstaking deliberation by the court to consider the contentions presented by both sides. There is absolutely no evidence that the plaintiffs did not have a full and fair opportunity to litigate the validity of patent '697 in Bendix, procedurally, substantively, and evidentially. The opportunity to litigate standards of Blonder-Tongue were met in the district court.
 The patents[9] having been declared invalid by the district court, plaintiffs appealed to this court. Both parties filed extensive briefs and were given two hours each for oral argument.
 Plaintiffs, on appeal, urged that the lower court had erred in holding that the Stevens and Dallas application was an anticipation of the Eisler patents in suit. In oral argument, counsel for Bendix admitted that the Stevens and Dallas application was not an anticipation of the metallic resist method of '697, so this court was not misled by the too broad holding of the district court.
 The plaintiffs next urged that the district court erred in holding that the Eisler patents were invalid for obviousness. They contended that the district court failed to use an objective standard in determining the issue of obviousness. The standard they claimed the court should have used was whether or not the Eisler inventions, at the time they were made, were obvious to a person of ordinary skill in the art. One of the basic themes of plaintiffs' appeal in Bendix, then, was that the district court applied the wrong standard as to obviousness and thus failed to grasp the issues and possibly the technical aspects of the subject matter in suit.
 This court considered the above allegations along with the other contentions raised by the plaintiffs in their appellate briefs and affirmed the decision of the district court. The affirmance was:
 "After careful consideration of the record, the arguments and the briefs of counsel, we are persuaded that the patent claims are invalid for obviousness in the light of the prior art for the reasons discussed in the opinion of the District Court. Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., D.C.Md., 218 F.Supp. 1. Affirmed." 327 F.2d at 498.
 Instead of mentioning anticipation in the opinion, the contentions raised by the plaintiffs as to obviousness were considered and rejected. In affirming the district court's decision, the court squarely held plaintiffs' patent claims were invalid for obviousness, necessarily holding that the trial court did apply an objective standard in determining the issue of obviousness.
 Having received an adverse decision from a panel of this court, plaintiffs filed a Petition For Rehearing En Banc. In their petition, they stated that Bendix was a test case and contended that the district court and the panel of this court both failed to apply the objective test for obviousness. They also contended that since Bendix's counsel admitted in oral argument that the Stevens and Dallas applications did not anticipate the metallic resist method of '697, the panel should not have affirmed on the basis of the district court's opinion as to obviousness because it was in error as to the anticipation issue. The court did not grant the Petition For Rehearing, emphasizing the decision of its panel.
 Plaintiffs next sought certiorari in the United States Supreme Court, which was denied in Technograph Printed Circuits, Ltd., et al. v. Bendix Corp., 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed.2d 36 (1964).
 In the face of recited adverse rulings in Bendix, the plaintiffs continued with infringement suits here, in the same district court, against the present defendants, relying on the rule of Triplett for the proposition that an adverse adjudication as to the claims of infringement of a patent does not preclude another suit on the same claims against a different defendant. While these suits were pending, in May, 1971, the Supreme Court decided Blonder-Tongue. There, as recited before, the court overruled Triplett to the extent of allowing a plea of collateral estoppel under the conditions set forth in Blonder-Tongue. The defendants here then pleaded collateral estoppel and moved to dismiss on the basis of Blonder-Tongue. After careful consideration of the briefs and argument of counsel for all parties involved, consideration of the Bendix case and its history and record, and a consideration of what plaintiffs alleged to be new evidence, the district court granted the motion to dismiss.
 The court below held as follows:
 "It is the Court's firm opinion that: (A) Plaintiffs in Bendix had 'a fair opportunity procedurally, substantively and evidentially to pursue' their 'claim the first time'; (B) the standards with respect to obviousness announced in Graham v. John Deere, 383 U.S. 1, 10, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) were met; (C) The opinions in the Bendix case do not indicate that it was one of those 'rare instances where the courts wholly failed to grasp the technical subject matter and issues in suit'; (D) the plaintiffs were not deprived 'without fault' of their own 'of crucial evidence or witnesses' in the Bendix case; and (E) 'it is just and equitable to allow the plea of estoppel' in these cases." (Footnotes omitted) 340 F.Supp. at 425.
 The district court set forth in detail its reasons for granting the motion in a well written opinion by Judge Watkins. 340 F.Supp. 423.
 The plaintiffs appealed. Their first contention in this court is that Bendix determined that the metallic resist process of '697 was disclosed by Eisler's filing of patent '960 on February 3, 1944. Thus, plaintiffs contend that the lower court's dictum about possible invalidity of '697 for indefiniteness, both in Bendix (218 F.Supp. at 43) and below (340 F.Supp. at 433), was wrong. The argument is also made by inference in plaintiffs' first contention that the district court's ruling on anticipation was also erroneous. Since this court in Bendix affirmed the district court's holding of invalidity of the Eisler patents, including '697, on the basis of obviousness, in light of the prior art, it is difficult to see the materiality of plaintiffs' first point.[10] The issue in the present cases is whether plaintiffs are estopped from litigating the validity of patent '697 after this court's affirmance in Bendix holding that '697 was invalid for obviousness, not whether a dictum of the district court and a point previously disposed of by concession are free from objection. We are of opinion that the first contention of plaintiffs does not disclose error.
 The second point on appeal is that both the district court and this court in Bendix "wholly failed to grasp the technical subject matter and issues in suit." Blonder-Tongue, 402 U.S. at 333, 91 S.Ct. at 1445. This point is based on the holding of the district court in Bendix that the Stevens and Dallas application anticipated all three of Eisler's patents.[11] Plaintiffs also say that the district court misread Stevens and Dallas and Whilems as teaching a metallic resist process. Because of this court's reliance in Bendix on the district court's opinion as to obviousness, plaintiffs contend that both courts were confused as to the subject matter in suit in Bendix.
 Contrary to plaintiffs' assertion, the fact that all contentions concerning anticipation were disposed of without controversy and not considered by this court made it crystal clear that they were no longer any part of the case. To repeat, during oral argument, counsel for Bendix admitted that the Stevens and Dallas application was not an anticipation of the metallic resist method of '697. This court did not affirm the district court in Bendix on the basis of anticipation, but on the ground of obviousness. Thus, the panel did understand the effect of the disclaimer by Bendix's counsel and neither approved of nor considered the district court's holding with reference to anticipation in affirming the decision of invalidity as to '697.
 Having again reviewed the actions of the district court in Bendix, we are of opinion that the district judge did not misconstrue Whilems or Stevens and Dallas to the extent that he wholly failed to understand the technical subject matter and issues. Whilems, the Stevens and Dallas application, and Eisler all concerned themselves with the use of various printing and engraving techniques to make electrical circuits. Where the district court erred in Bendix on the issue of anticipation was his necessary holding that the precise claims of the Stevens and Dallas application anticipated Eisler '697. Even if Whilems and the Stevens and Dallas application were so misconstrued by the district court, we are of opinion that the opinion in Bendix clearly shows that this was not "one of those relatively rare instances where the courts wholly failed to grasp the technical subject matter and issues in suit."[12] The issue of anticipation having been removed, there is no evidence to show that this court wholly failed to grasp the situation in Bendix, either the issues or technical subject matter.
 Plaintiffs next contend that the district court, in Bendix, failed to apply the standards set out in Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).[13] They allege that it failed to indicate why it would have been obvious to a person of ordinary skill in the electrical art to look to the non-electrical arts to make bimetallic conductive pathway patterns for electrical components. Further, it is argued that since the district court misread the Stevens and Dallas application, it was not able to accurately apply the objective standards of Graham.
 Graham was decided subsequent to Bendix but did not change the test of 35 U.S.C. Sec. 103.[14] It merely set out inquiries to be made in determining whether a patent is obvious under Sec. 103 and gives effect to the objective test for obviousness set out in the statute.
 In Blonder-Tongue, the court said that one of the appropriate inquiries where the issue was that of obviousness should be ". . . whether the first validity determination purported to employ the standards announced in Graham v. John Deere Co., supra." 402 U.S. at 333, 91 S.Ct. at 1445.
 In the instant cases, it is the opinion of the court that the district court in Bendix did employ the standards required by Graham. The district court specifically held that the Eisler patents, including '697, were invalid for obviousness because they "would have been obvious at the time the [alleged] invention[s] [were] made to a person having ordinary skill in the art." 218 F.Supp. at 31. Throughout the district court's opinion, it discussed in detail the scope and content of the prior art as well as the differences between the prior art and the claims at issue in Bendix. 218 F.Supp. 1, 25-38. Concerning the level of ordinary skill in the art, it is inconceivable that the district court could have held the Eisler patents invalid because they "would have been obvious at the time the [alleged] invention[s] [were] made to a person having ordinary skill in the art to which said subject matter pertains"[15] without considering such a standard. At 218 F.Supp. 24, the court said:
 "When available literature, both patents and publications, not cited, is considered, and also the ability of persons unaware of the alleged inventions to reach the same results by the same means, the court has no hesitation in holding the patents, and the claims in suit, to be invalid."
 This court is satisfied that the just quoted language from Bendix shows that the district court did consider the level of ordinary skill in the art in determining that Eisler's patent '697 was invalid for obviousness[16] and that the standard used by the district court is compatible with that required by Graham.[17]
 Plaintiffs also raise an issue that the Norris Patent No. 2,282,203 ('203), issued May 5, 1942, was improperly considered by the court in Bendix. Even if this were true, plaintiffs have shown no reason why they could not have made the same argument to this court in the Bendix appeal. They had a fair chance to litigate the issue in Bendix and it may not be raised now. In all events, it does not show that the district court, in Bendix, did not grasp the technical subject matter or the issues involved.
 The fourth point on appeal is that plaintiffs were deprived of crucial evidence through no fault of their own. The crucial evidence to which plaintiffs refer is the September 30, 1943 notes of one Milton D. Rubin.[18] They contend that counsel for Bendix and Rubin, himself, misled them into a self-confessed failure to get access to the Rubin notes. They argue that they should not be collaterally estopped from asserting the validity of '697 because not having the Rubin notes prevented them from having a full and fair opportunity to litigate the issue of validity in the Bendix case.
 First, the plaintiffs allege that the Rubin notes were crucial evidence because they wanted to show that Rubin, being a person well beyond the ordinary skill in the art,[19] had experimented with dissimilar metals but failed to discover the metallic resist process revealed in '697. They argue that these notes, showing a failure to achieve the metallic resist process by one skilled in the art, could have resulted in a different result on the issue of obviousness of '697 in the Bendix case.
 It should first be pointed out that the Supreme Court, in Graham, gave effect to the objective test for obviousness under Sec. 103. After setting out the three basic factual inquiries to be made in applying such objective test, the opinion then stated:
 "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." 383 U.S. at 17, 86 S.Ct. at 694.
 Thus, the failure of others to achieve the results of an allegedly valid patent does not necessarily make that patent non-obvious; such failure is only evidence that the court may look to in applying the objective test of Sec. 103 along with all the other evidence in the case. It is not controlling as a matter of law and is a secondary consideration.[20]
 We turn now to the question of just how crucial the Rubin notes were to plaintiffs' case in Bendix. At p. 38 of their brief, plaintiffs state that the Rubin notes, "plus the stated prior art failures, is objectively persuasive of obviousness of '697." Although plaintiffs' statement may be abstractly correct, we believe that the Rubin notes, had they been introduced in the Bendix trial, probably would not have caused a different result. We feel that these notes would have been merely cumulative evidence entitled to secondary consideration. See Graham. In plaintiffs' appeal in Bendix, the point is raised that many who possessed more than ordinary skill in the art had failed to discover the processes described by Eisler's alleged inventions, thus showing non-obviousness. (See Brief of Plaintiffs in Bendix, p. 30.) Rubin's notes were at best cumulative. This court rejected this argument then, and we are of opinion now that the presentation of the Rubin notes would not have changed our decision, especially since they were cumulative evidence of a secondary character.[21] We do not then consider the Rubin notes crucial evidence within the meaning of Blonder-Tongue.
 Assuming, however, the Rubin notes to be crucial evidence, the record shows that plaintiffs were not deprived of them through no fault of their own.
 Technograph purchased Rubin's patent '119 on July 7, 1954, for 1500 shares of Technograph common stock, but did not get his notes as to the conception of the patent. Early in 1961, as part of the pre-trial procedures, Bendix filed a "Supplemental Answer to Plaintiff's Interrogatory 6," which had asked Bendix to identify each instance of alleged prior invention of the subject matter of the patents in suit. Bendix's supplemental answer said that claims 4 and 10 through 16 of '697 were conceived of by Rubin as early as September, 1943. [The date of the notes is 9/30/43] (See Appendix B, p. B-12.) Pursuant to this information, plaintiffs interviewed Rubin and his attorney on September 5, 1961. At this conference, Rubin informed the plaintiffs that if they wanted him to search his files for such information, he would have to be paid. The plaintiffs assumed, without any basis, that Rubin wanted something in excess of his regular rates. They then terminated the interview because they say they felt the Rubin process was fully set forth in his patent and that it was not related to the Eisler patents in suit. The plaintiffs paid Rubin and his counsel for their time spent in the interview and pursued the matter no further. On September 22, 1961, counsel for Bendix advised the trial court and plaintiffs' counsel that Rubin would testify in the Bendix case. In outlining the general testimony Rubin was expected to give, Bendix's counsel stated that Rubin would testify that during 1943 he conceived a process wherein "a negative representation of the desired circuit component was printed as by photographic means on the metal surface of a foil-plastic laminate, a dissimilar metal was deposited on the uncoated portions of the foil, the resist was removed, and the exposed metal was then removed by etching." (Appendix B, p. B-37.) On September 27, 1961, Bendix's counsel informed the trial court and plaintiffs' counsel that Bendix had decided not to call Rubin because it had been learned that Rubin had received payment from the plaintiffs for consultative services in the same litigation.[22] Rubin and his notes were not produced at the Bendix trial.
 Plaintiffs now contend that the McKie memo of September 7, 1961[23] shows that counsel for Bendix knew that the Rubin notes showed a failure to achieve the metallic resist process of '697. They further allege that Bendix and Rubin misled them by implying that all the processes Rubin dealt with were set forth in his patent '119. Thus, they argue that they did not try to get Rubin's notes because they had his patent.
 We disagree with the contention that plaintiffs were misled by Bendix and Rubin. We believe that Bendix's supplemental answer to their interrogatory filed in January, 1961 and the September 22, 1961 outline of Rubin's expected testimony was more than sufficient to put plaintiffs on notice that Rubin might have notes on processes which were relevant to the subject matter in suit. Plaintiffs show no basis for their assumption that Rubin wanted more than his usual fee for searching his records. The truth probably is that both parties were uncertain of how Rubin's testimony might affect their case and therefore neither party called him to testify in the Bendix trial. Additionally, plaintiffs have offered no plausible excuse whatsoever for their failure to take the discovery deposition of Rubin. In view of the supplemental answer to the interrogatory and the outline of Rubin's proposed testimony, the failure to even attempt to take Rubin's discovery deposition, standing alone, would be sufficient to take the Rubin notes out of the "no fault of their own" requirement of Blonder-Tongue.
 The fifth and final point that the plaintiffs raise here is that it is not just or equitable to estop them from relitigating the validity of Eisler's patent '697 in view of a decision in the House of Lords on February 24, 1971 which sustained the validity of British patent No. 639,178.[24] Plaintiffs claim that British patent '178 is similar to Eisler's American patent '165, which is broader than '697, and thus '697, being more narrow, is a stronger patent than '165 or '178. From this, plaintiffs argue that they should be allowed to relitigate the validity of '697 in light of the House of Lords decision.
 We disagree with plaintiffs' contention on this point. We agree with the analysis below of the House of Lords decision. 340 F.Supp. 423, 436-437. More importantly, allowing relitigation in the light of the House of Lords decision would allow subsequent litigation in light of a decision in a foreign forum which would not have been permitted in a domestic forum by Blonder-Tongue. We are not constrained to so weaken the Blonder-Tongue ruling by encouraging disappointed plaintiff patent holders to resort to a foreign forum in order to escape the consequences of domestic procedural rules in federal courts set out by the Supreme Court.
 A final point which should be mentioned is that, prior to the decision in Bendix, plaintiffs had filed several actions in Chicago for infringement of the same patents. After the Bendix decision, the Chicago district court granted summary judgment of dismissal based on Bendix. The Seventh Circuit Court of Appeals reversed.[25] Upon remand to the district court, a class action was commenced.[26] The action was tried to the court. Before final argument, Blonder-Tongue was decided. The defendants then moved to dismiss on the ground of collateral estoppel based on Bendix. The district court in Illinois, after the decision of the district court in Maryland in the instant cases, sustained the pleas of estoppel, holding that plaintiffs had had a full and fair opportunity to litigate the issue of validity in Bendix.i. Technograph Printed Circuits, Ltd., et al. v. Methode Electronics, Inc., et al., 174 U.S.P.Q. 197 (N.D.Ill.1972), appeal to the Seventh Circuit pending.
 In conclusion, we should repeat the Supreme Court's statement in allowing the defense of collateral estoppel in patent cases:
 "Even conceding the extreme intricacy of some patent cases, we should keep firmly in mind that we are considering the situation where the patentee was plaintiff in the prior suit and chose to litigate at that time and place. Presumably he was prepared to litigate and to litigate to the finish against the defendant there involved. Patent litigation characteristically proceeds with some deliberation and, with the avenues for discovery available under the present rules of procedure, there is no reason to suppose that plaintiff patentees would face either surprise or unusual difficulties in getting all relevant and probative evidence before the court in the first litigation." 402 U.S. at 332, 91 S.Ct. at 1444.
 Here, the same plaintiffs considered Bendix a test case[27] by which they sought to establish the validity of Eisler's patents '165, '960, and '697. They now seek to relitigate the issue of validity as to '697. They failed to convince the district court in Bendix of its validity, and they failed on appeal to convince us that the district court was wrong in the instant cases, plaintiffs have failed to convince the same district judge who decided Bendix that they did not have a full and fair opportunity to litigate in Bendix. Again, we agree with the district court. We are of opinion that the plaintiffs had a full and fair opportunity to litigate the validity of '697 in Bendix and that it is just and equitable to allow defendants' pleas of estoppel. We believe the instant cases show precisely why the Supreme Court, in Blonder-Tongue, overruled Triplett and commenced the sustaining of pleas of estoppel by judgment in certain patent cases.[28]
 The judgment of the district court is accordingly
 Affirmed.
 
 
 [1]
 The first Eisler application for a United States Patent, Serial Number 520,991, was filed February 3, 1944. As a result of such application, Patent No. 2,441,960 ('960) issued on May 25, 1948. On February 27, 1948, divisional application 11,798 was filed out of which Patent No. 2,587,568 issued on February 26, 1952, and was subsequently reissued on June 12, 1956 as United States Reissue 24,165 ('165). Divisional application 11,798 was further divided by Application 261,989, filed December 17, 1951, and as a result Patent No. 2,706,697 ('697) issued on April 15, 1955. Patent '697 is the only one in issue in this case since plaintiffs voluntarily stipulated to dismissal, with prejudice, contentions concerning patents '165 and '960
 Patent '697 describes what is called the metallic resist process for the manufacture of printed electrical circuits. The process starts with an insulation-backed metal foil. A negative circuit imprint is made on the foil in acid resistant ink. Dissimilar metal is then plated onto the bare foil areas. The ink is then removed from the foil areas and the foil which is then bared is etched away in an acid bath that attacks the foil, but not the dissimilar metal. This leaves unetched the dissimilar metal and the foil protected thereunder. The effect is that the plated dissimilar metal acts as a resist to protect the underlying foil areas from being etched away.
 
 
 [2]
 Technograph Printed Cir. Ltd. v. Martin-Marietta Corp., 340 F.Supp. 423 (D.Md.1972), appealed in these cases
 
 
 [3]
 On remand, Blonder-Tongue pleaded estoppel and the district court, although it previously had held the patent valid, sustained the plea and entered judgment for the defendant. University of Illinois Found. v. Blonder-Tongue Lab. Inc., 334 F.Supp. 47 (N.D.Ill.1971), aff'd. 465 F.2d 380 (7th Cir. 1972)
 
 
 [4]
 Patent 2,706,697 to Paul Eisler-April 19, 1955 "Manufacture of Electric Circuit Components."
 Application February 27, 1948, Serial No. 11,798, now Patent No. 2,587,568, dated February 26, 1952, which is a division of application Serial No. 520,991, February 3, 1944, now Patent No. 2,441,960, dated May 25, 1948. Divided and this application December 17, 1951, Serial No. 261,989.
 CLAIMS
 
 
 [4]
 A method of manufacturing the conductive metal portions of electric and magnetic circuits of the kind including a conductive pathway pattern upon an insulation backing comprising the steps of printing a negative representation of the desired pathway pattern upon the metal surface of a sheet of foil clad insulation, thereupon depositing dissimilar metal upon the unprinted surfaces of the foil, and finally removing the foil from the imprinted areas whereby an insulation backed metallic pathway pattern is formed
 
 
 [10]
 A method of manufacturing a component of electric and magnetic circuit systems involving an insulation backed conductive pathway pattern, which comprises providing insulation backed foil, then printing a negative representation of the pattern upon said foil, depositing a layer of metal dissimilar to the metal of said foil upon all exposed parts of said foil, then removing said representation from the foil, and finally removing all parts of the foil exposed by said removal of the representation by chemical action attacking the metal of said foil but not said deposited dissimilar metal whereby said pathway pattern is formed
 
 
 [11]
 The method of claim 10 wherein the negative representation of the pattern is produced by letterpress printing
 
 
 [12]
 The method of claim 10 wherein the negative representation of the pattern is produced by offset printing
 
 
 [13]
 The method of claim 10 wherein the negative representation of the pattern is produced by photo-mechanical means
 
 
 [14]
 A method of manufacturing a component of electric and magnetic circuit systems involving an insulation backed conductive pathway pattern, which comprises providing insulation backed foil, then printing a negative representation of the pattern upon said foil with a resist medium, then depositing by electrodeposition a layer of a metal dissimilar to the metal of said foil upon all exposed parts of said foil, then removing the resist medium, and finally etching away all parts of said foil exposed by the removal of the medium in a bath attacking the metal of said foil but not said dissimilar metal whereby said pathway pattern is formed
 In Bendix, claims 4, 10, and 14 were specifically held invalid. 218 F.Supp. 1, 58. An examination of claims 11, 12, and 13 shows that they are dependent on claim 10, so that the holding of invalidity as to claim 10, of necessity, invalidated these claims also. Thus, the issues before the court in Bendix and the present cases are identical.
 
 
 [5]
 Bendix, 218 F.Supp. pp. 3-5
 
 
 [6]
 Bendix, pp. 5-7
 
 
 [7]
 Bendix, pp. 7-23
 
 
 [8]
 Bendix, pp. 7-23
 
 
 [9]
 See 218 F.Supp. 1, 58 for the precise patent and claim numbers invalidated by the decision
 
 
 [10]
 This might possibly be relevant if it were intended to show that the district court was confused about the subject matter in suit. However, even if asserted for this proposition, this court is of opinion that it is without merit
 
 
 [11]
 See note 10. The continued assertion of this point, disposed of by concession in the Bendix appeal, might lend itself to the inference that it is a tactical diversion
 
 
 [12]
 The Bendix opinion shows that the trial judge understood the technical subject matter and the issues in suit. He spent four days of travel visiting the plants of licensees and of Bendix; spent twenty-nine court days trying the case; and had numerous pre-trial conferences. Plaintiffs do not contend that his description of the Eisler patents in Bendix was wrong or that his description of plaintiffs' contentions at 218 F.Supp. 6 was inaccurate. They merely assert that he misread two of the numerous patent documents discussed in the opinion. Surely even if this were so, it would not be a case where a judge "wholly fails to grasp the technical subject matter and issues in suit." As the Supreme Court said in Blonder-Tongue: "But assuming a patent case so difficult as to provoke a frank admission of judicial uncertainty, one might ask what reason there is to expect that a second district judge or court of appeals would be able to decide the issue more accurately." 402 U.S. at 331, 91 S.Ct. at 1444
 
 
 [13]
 ". . . under Sec. 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined." 383 U.S. at 17, 86 S.Ct. at 694
 
 
 [14]
 Section 103 of 35 U.S.C. provides that a patent is invalid for obviousness "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."
 
 
 [15]
 218 F.Supp. at 31
 
 
 [16]
 The use of an objective standard, in accordance with Sec. 103, in determining the issue of obviousness has been the rule in this circuit at least since 1961. Honolulu Oil Corporation v. Shelby Poultry Company, 293 F.2d 127, 131 (4th Cir. 1961). There is no reason to believe nor evidence to show that the district court, in Bendix, applied anything other than the objective test of obviousness required by Graham. The record shows that plaintiffs' main argument in their Petition for Rehearing En Banc to this Court in Bendix was that an objective standard was not used in determining the issue of obviousness. With the issue then squarely before the court, the Petition was not granted, and again we do not accept the argument on this point
 In Anderson's-Black Rock v. Pavement Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969), the court held that a patent combining known elements, a radiantheat burner, a spreader, and a tamper and screed, on one chassis was invalid because it was "reasonably obvious to one with ordinary skill in the art." 396 U.S. at 60, 90 S.Ct. at 307. In dealing with the issue of obviousness, the court quoted the factual inquiries set out in Graham, and then said: "We conclude further that to those skilled in the art the use of the old elements in combination was not an invention by the obvious-nonobvious standard." 396 U.S. at 62, 90 S.Ct. at 309.
 Nowhere in Anderson's-Black Rock did the Supreme Court set out what was the level of ordinary skill in the pertinent art, but the court necessarily considered it because of the holding that the patent was obvious.
 
 
 [17]
 The district court's discussion of the development of printed electrical circuits, the various pertinent patents and related documents, the state of the prior art, the comparison between the prior art and Eisler, is remarkably similar to the Supreme Court's factual analysis in Graham
 
 
 [18]
 The Rubin notes of September 30, 1943 read as follows: "9/30/43-Gum bichromate albumen photomechanical process-for producing unitary process electronic-circuit
 Plate silver on plastic by mirror process of chemical deposition.
 Then coat with gum bichromate albumen or cold enamel. Then expose with negative having opaque lines of circuit, remainder transparent. Then treat with etching ink, and develop, removing albumen from lines of circuit, exposing the pure silver base, leaving the remainder coated. Then treat with resin (rosin, asphaltum or dragonsblood powder) if cold enamel was not used, and burn in. Then plate circuit on in copper clear the resist off with strong potash or lye (caustic) sol. and silver off with nitric acid and then silver plate and lacquer.
 This method can also be used for plating solder or brazing alloy on fittings to be furnace-brazed. This constitutes an accurate method of placing solder or braze at joints." (Appendix Vol. II, p. 190a.)
 
 
 [19]
 Rubin's patent No. 2,443,119 ('119) used the same metal and not a dissimilar metal when plating upon the conductive surface not covered by the greasy ink. Then the ink was removed and the metal covered by the ink was etched away by an acid bath. However, during this process, the deposited added metal was attacked by the acid as well as the base metal
 Eisler's '697 process used a dissimilar metal over the base metal which protected the base metal under it during the etching process.
 
 
 [20]
 We realize that much evidence as to non-obviousness must, of necessity, be negative evidence
 
 
 [21]
 It should also be noted that in plaintiffs' suit against the United States in the Court of Claims, Rubin was a witness and the notes were before Commissioner Davis. Presumably, plaintiffs made every argument as to the effect of Rubin's failure on the issue of obviousness of '697. Commissioner Davis, however, recommended that '697 be held invalid. He said, in reference to Rubin as a witness, that his testimony showed that "he routinely looked to old and well-known practices of the printing art in the search for better ways to make electrical components." (Appendix-Vol. III, p. 440a.) The Court of Claims has not yet decided whether or not to accept the recommendation of Commissioner Davis or whether or not to apply the doctrine of collateral estoppel under Blonder-Tongue
 
 
 [22]
 It should also be remembered that Rubin had sold his patent '119 to Technograph for 1500 shares of Technograph common stock. The plaintiffs state in their brief that Rubin had disposed of this stock before September 5, 1961, but the record contains no contemporary reference to such disposal. The affidavit on which the statement is based is dated June, 1971. Whether the defendants knew of Rubin's stock ownership in Technograph is not known
 
 
 [23]
 The McKie memo was written by Bendix's counsel, which did mention the Rubin notes of September 30, 1943. (Appendix Vol. II, pp. 216a-218a.) But, there is no indication whether Rubin showed counsel these notes or counsel found them on his own. Also, there is no indication when Bendix's counsel first saw them. Bendix's counsel obviously had seen the Rubin notes by January, 1961, possibly in September, 1960, when he examined Rubin's materials on a $20 per hour consulting basis. Appendix B, pp. B-12, B-23, B-25
 
 
 [24]
 Mills & Rockley (Electronics) Ltd. v. Technograph Printed Circuits Ltd., House of Lords, (decided February 24, 1971), Appendix-Vol. II, pp. 178a-204a
 
 
 [25]
 Technograph Printed Circuits v. Methode Electronics, 356 F.2d 442 (7th Cir. 1966), cert. den. 384 U.S. 950, 86 S.Ct. 1570, 16 L.Ed.2d 547 and 384 U.S. 1002, 86 S.Ct. 1925, 16 L.Ed.2d 1016 (1966). The basis for reversal was Triplett v. Lowell, supra, as expressed in Aghnides v. Holden, 226 F.2d 949 (7th Cir. 1955)
 
 
 [26]
 Technograph Printed Circuits, Ltd. v. Methode Electronics, 285 F.Supp. 714 (N.D.Ill.1968)
 
 
 [27]
 Plaintiffs' Petition For Rehearing En Banc before this court in the Bendix appeal, p. 1
 
 
 [28]
 Blonder-Tongue has either been applied, not applied, mentioned, or remand has been granted in light of it, in the following patent cases: University of Ill. Found. v. Blonder-Tongue Lab. Inc., 334 F.Supp. 47 (N.D.Ill.1971), aff'd. 465 F.2d 380 (7th Cir. 1972), (Blonder-Tongue on remand from the Supreme Court); Southwest Products Co. v. Heim Universal Corp., 443 F.2d 621, 624 (2nd Cir. 1971); Monsanto Co. v. Dawson Chemical Co., 443 F.2d 1035, 1038 (5th Cir. 1971), cert. den. 405 U.S. 974, 92 S.Ct. 1191, 31 L.Ed.2d 248 (1972); Grantham v. McGraw-Edison Co., 444 F.2d 210, 216 (7th Cir. 1971); Black, Sivalls & Bryson, Inc. v. National Tank Co., 445 F.2d 922, 926 (10th Cir. 1971); Woodstream Corp. v. Herter's, Inc., 446 F.2d 1143, 1149 (8th Cir. 1971); Boutell v. Volk, 449 F.2d 673, 677 (10th Cir. 1971); Business Forms Finishing Service, Inc. v. Carson, 452 F.2d 70, 74 (7th Cir. 1971); Monsanto Co. v. Rohm & Haas Co., 456 F.2d 592, 595, 604 (3rd Cir. 1972), cert. den. 407 U.S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972); Kaiser Industries Corp. v. Wheeling-Pittsburgh Steel Corp., 328 F.Supp. 365, 370 (D.Del.1971); Hickory Springs Mfg. Co. v. Fredman Bros. Furniture Co., 330 F.Supp. 978, 980 (S.D.Ill.1971); In Re Suess Patent Infringement Litigation, 331 F.Supp. 549, 550 (Jud.Pan.Mult.Lit.1971); Butterfield v. Oculus Contact Lens Co., 332 F.Supp. 750, 761 (N.D.Ill.1971); Sampson v. Ampex Corp., 333 F.Supp. 59, 65 (S.D.N.Y.1971), motion for reargument den., 335 F.Supp. 242 (S.D.N.Y.1971); Nickerson v. Kutschera, 333 F.Supp. 1097, 1098 (D.Del.1971); Mobil Oil Corp. v. W. R. Grace & Co., 334 F.Supp. 117, 131 (S.D.Tex.1971); Blumcraft of Pittsburgh v. Architectural Art Mfg., Inc., 337 F.Supp. 853, 854 (D.Kan.1972), aff'd. 459 F.2d 482 (10th Cir. 1972); Ransburg Electro-Coating Corp. v. Spiller & Spiller, Inc., 340 F.Supp. 1385, 1389 (N.D.Ill.1972); In Re Yarn Processing Patent Validity Litigation, 341 F.Supp. 376 (Jud.Pan.Mult.Lit.1972); Blumcraft of Pittsburgh v. Kawneer Co., 341 F.Supp. 1018, 1019 (N.D.Ga.1971); Kaehni v. Diffraction Co., 342 F.Supp. 523, 526 (D.Md.1972); Dale Electronics, Inc. v. R. C. L. Electronics, Inc., 53 F.R.D. 531, 534 (D.N.H.1971)